in proper cases, or prevents interference in case the vested rights of any citizen are interfered with. But certainly the Legislature could properly provide that all these matters involving the administration of the educational system of the state should be confided in the first instance to the educational authorities.

[3] The relators sought to constitute themselves a separate district, pursuant to the authority granted in the education law, and they must take it as a whole. They cannot accept one part of it and reject another. The Legislature might have repealed the education law the day before the village meeting, and there would have been no authority for the action taken.

[4] So, when they grant the privilege, it seems to me they may provide for its review by the educational authorities. The village itself is a municipal corporation created by the Legislature. It may be that the commissioner of education will sustain the contention of the relators when the matter comes before him. If he does not, and his action is illegal, or without jurisdiction, I am very sure that it can be reviewed notwithstanding the sweeping provisions of the statute which at first blush would seem to make him independent of all authority. But, if he has jurisdiction of the matter and of the parties, the courts will not interfere with his action any more than in many similar departmental transactions under the law. The courts are not without jurisdiction, but, when these matters are left by the Legislature to other legally constituted tribunals, the courts do not interfere. The language of the statute, which seems to exempt the commissioner from review, has been before the courts, and the individual citizen is not without remedy, if he has a legal grievance. Light v. Skinner, 159 N. Y. 162, 53 N. E. 806; Matter of Light, 30 App. Div. 50, 51 N. Y. Supp. 743; People ex rel. Walrath v. O'Brien, 112 App. Div. 97, 97 N. Y. Supp. 1145; People v. Skinner, 74 App. Div. 58, 77 N. Y. Supp. 36; Union F. S. Dist. v. Village of Glen Park, 109 App. Div. 414, 96 N. Y. Supp. 428.

I think that the relators' application is premature, and that the writ should be quashed and the proceedings dismissed.

---

BURTON v. NEW YORK CENT. & H. R. R. CO.

HEEREN v. SAME.

(Supreme Court, Appellate Division, Second Department. December 15, 1911.)

1. EXTRADITION (§ 37*)—CONSTITUTIONAL LAW (§ 207*)—FOREIGN CITIZEN—POWER TO ARREST—PRIVILEGES AND IMMUNITIES OF CITIZENS.

Since, by the direct provisions of Code Cr. Proc. § 167, to "arrest" is to take a person into custody that he may be held to answer for a crime, the arrest in this state of a citizen of another state believed to be guilty of the commission of a crime in such other state is governed by the same rules applicable to the arrest of citizens of New York, in view of the provision of Const. U. S. art. 4, § 2, subd. 1, that the citizens of each state shall be entitled to all of the privileges and immuni-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ties of the citizens of the several states, and it is not essential that all of the steps for his rendition have been taken at the time of the arrest.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. § 34; Dec. Dig. § 37;* Constitutional Law, Cent. Dig. §§ 625–648; Dec. Dig. § 207.*]

2. ARREST (§ 68*)—ARREST WITHOUT WARRANT—FELONY CHARGE.

Code Cr. Proc. § 170, provides that an arrest may be made for a felony on any day or at any time of the day or night. Section 177 permits a peace officer to make an arrest without a warrant for a crime committed in his presence, or in case of felony, when not committed in his presence, when he has reasonable cause to believe that the person to be arrested committed the felony which was in fact committed. Section 179 provides that a peace officer may at night without warrant arrest one whom he has reasonable cause to believe committed a felony, though it appear that the person arrested did not commit it, and section 178 provides that to make an arrest, as provided in section 177, the officer may break open an outer or inner door of a building, if refused admittance. *Held*, that peace officers who were informed by telegraph from the police department of another city that a person answering the description of one suspected of the crime of murder was upon a railroad train could, under the statutes, as well as at common law, enter the train at night, and force their way into the berth of such person, and arrest and remove her.

[Ed. Note.—For other cases, see Arrest, Dec. Dig. § 68.*]

3. CARRIERS (§ 284*)—PASSENGERS—PROTECTION FROM ARREST.

A railroad company would not be liable for damages for the arrest of a passenger, a resident in another state, and her removal from the train by peace officers under the belief that she was a criminal wanted for murders committed in another state, if the officers were, under the circumstances, authorized to make the arrest, as it would have been illegal for the company's employés to have refused to permit the arrest.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 284.*]

4. EVIDENCE (§ 80*)—PRESUMPTIONS—COMMON LAW.

It is presumed that the common law exists in each of the states.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 101; Dec. Dig. § 80;* Common Law, Cent. Dig. §§ 14–16.]

5. CRIMINAL LAW (§ 27*)—"FELONY."

At common law, a felony was an offense, a conviction for which caused forfeiture of lands or goods, or both, and was also subject to punishment by death, or otherwise.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 29–31; Dec. Dig. § 27.*

For other definitions, see Words and Phrases, vol. 3, pp. 2736–2744; vol. 8, p. 7662.]

6. HOMICIDE (§ 7*)—MURDER.

Both at common law and under Penal Law (Consol. Laws 1909, c. 40) § 2, a murder is a felony.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 12; Dec. Dig. § 7.*]

Thomas, J., dissenting.

Actions by Lucinda Burton and by Cora B. Heeren against the New York Central & Hudson River Railroad Company. Upon exceptions to be heard in the first instance upon denial of plaintiffs' motions to go to the jury upon the issues, and upon denial of their motions for a new trial. Judgment directed for defendant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before JENKS, P. J., and THOMAS, CARR, WOOD-WARD, and RICH, JJ.

William F. Connell, for plaintiffs.

Robert A. Kutschbach, for defendant.

WOODWARD, J. The facts in the above cases are practically identical, and they were tried together. There is no dispute about the material facts. The plaintiffs, mother and daughter, residents of Franklin, Pa., purchased tickets from the defendant at that point, entitling them to passage from Franklin to New York City, by way of Ashtabula, on the Lake Shore & Michigan Southern and the New York Central & Hudson River Railroads, on the 8th day of May, 1908. While passengers upon the defendant's train, and at or near Erie, Pa., the plaintiffs purchased sleeping car berth No. 1, and, when the train reached Erie at about 10 o'clock, they retired to their compartment, disrobed, and went to sleep. The train reached Syracuse at midnight, and during the 10 minutes that the train remained at the station two police officers entered the car, demanding of the conductor that they be directed to berth No. 1 for the purpose of interviewing the two women who were occupying the berth, alleging that one of them was believed to be Mrs. Guinness of Laporte, Ind., who was at that time alleged to have been implicated in a series of atrocious murders. The defendant's conductor asked for the authority of these officers, and was told that they were police officers, they at the same time displaying their badges, and upon this assurance the officers were conducted to the compartment where the plaintiffs were sleeping. The officers opened the curtains, and had some conversation with the plaintiffs, the latter demanding to know why they were thus disturbed, and the officers told them that they were wanted and commanding them to get up and leave the train, threatening to take them out without an opportunity for dressing. The plaintiffs got up, and, after putting on a portion of their clothes, were permitted by the defendant's conductor to go into the stateroom, where they finished dressing in the presence of one of the officers, the train in the meantime having left the Syracuse station on time. The officers paid their fare to Utica, and defendant's conductor gave the plaintiffs a receipt entitling them to recover the amount of the unused portion of their tickets, and advised the plaintiffs to leave the train with the officers without trouble, and this they did at Utica, from whence they returned to Syracuse upon a later train, the officers paying the return fares. At Syracuse the plaintiffs were taken to police headquarters, where they were given over to the matron, and by her stripped and searched, and finally at about 4 o'clock of the following day they were permitted to resume their journey to New York; it being ascertained that they were not the persons whom the officers were looking for.

This action is brought, not against the officers, but against the defendant railroad company, upon the theory that it was the duty of the defendant to perform its contract of carriage, and to protect the plaintiffs against the indignities and the humiliations to which they

were subjected by the officers. The case is peculiarly aggravating. From the evidence it appears that these women, having no connection with the Indiana or any other crime, were treated with great brutality by the officers, who apparently felt that they had a license to forget all that belongs to their office as peace conservers, and to bully these two defenseless women, whom they had been told by telegraph from Rochester were identified with the Indiana crimes, and it would be worth while to deal with them as the facts seem to warrant, but that case is not here for determination. The question here is as to the duty of the defendant in the premises.

[1] The plaintiffs urge that the right to arrest in this state the citizens of another state for a crime committed against the laws of that other state is wholly regulated by the Constitution of the United States and the act of Congress of 1793, and that this state has no authority to cause the arrest of such citizen without first complying with the requirements of the United States Constitution, for this state does not possess by comity, or otherwise, the right to detain or arrest the citizen of another state. The plaintiff cites many authorities for this proposition, but none of them, we apprehend, goes to the extent of holding that a citizen of a sister state may not be arrested in this state for a crime committed in such sister state until all of the steps have been taken which would justify the rendition of such person. As well say that a man might not be arrested in this state for murder until he has been formally charged with crime by a grand jury. The definition of "arrest," as given by the Code of Criminal Procedure (section 167), "is the taking of a person into custody that he may be held to answer for a crime," and as it is made the duty of the executive authority of the state, under given conditions, to surrender persons charged with crime in sister states, we apprehend that the arrest of persons believed to have been guilty of crimes in other states, that they "may be held to answer for a crime," is governed by the same rules which apply to citizens of this state within our own jurisdiction. This is in harmony with that provision of the Constitution of the United States (article 4, § 2, subd. 1) which provides that the "citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," as construed by the court in Kimmish v. Ball, 129 U. S. 217, 222, 9 Sup. Ct. 277, 279 (32 L. Ed. 695), where the court say that:

"The clause of the Constitution declaring that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states does not give nonresident citizens of Iowa any greater privileges and immunities in that state than her own citizens there enjoy."

[2] If we are right in this proposition, we are to view the acts of the defendant in the present cases in exactly the same light that we would view the question if the plaintiffs had been citizens of the state of New York and residing here. That is all that can be fairly asked, that citizens of other states, within our jurisdiction, be treated in the same manner that we treat our own citizens. Section 170 of the Code of Criminal Procedure provides that if "the crime charged be a felony, the arrest may be made on any day, and at any

time of the day or during any night," and in the case now under consideration the crime was murder, so that the particular time of the arrest is of no consequence. Section 177 of the Code of Criminal Procedure provides that a—

"peace officer may, without a warrant, arrest a person, (1) for a crime, committed or attempted in his presence; (2) when the person arrested has committed a felony, although not in his presence; (3) when a felony has in fact been committed, and he has reasonable cause for believing the person to be arrested to have committed it."

Section 179 further provides that a peace officer—

"may also, at night, without a warrant, arrest any person whom he has reasonable cause for believing to have committed a felony, and is justified in making the arrest, though it afterward appear that a felony had been committed, but that the person arrested did not commit it."

Section 178 of the Code of Criminal Procedure likewise provides that:

"To make an arrest, as provided in the last section, the officer may break open an outer or inner door or window of a building, if, after notice of his office and purpose, he be refused admittance."

It thus appears that, in so far at least as citizens of this state are concerned in the commission of a crime within this jurisdiction, the peace officers of the city of Syracuse would have been justified in making the arrest which was made upon the information by telegraph from the police department of the city of Rochester that a felony had been committed, and that a person answering the description of the person suspected of the crime was upon the defendant's train in a particular berth, and this was the rule of the common law. Burns v. Erben, 40 N. Y. 463, 466, and authorities there cited; Kurtz v. Moffitt, 115 U. S. 487, 504, 6 Sup. Ct. 148, 29 L. Ed. 458, and authorities there cited.

[3] Being authorized to make the arrest, the peace officers would have been justified in using any force necessary to this end, and the agents and servants of the defendant would have been acting contrary to law if they had refused to permit the arrest to be made. The peace officers, acting within their authority, superseded the authority of the conductor and servants of the defendant in charge of the train, the plaintiffs, by operation of law, were transferred to the custody of the policemen, and the train officials ceased to have any control over them, and the defendant could not, therefore, be held liable for any of the indignities suffered by the plaintiffs. This was practically decided in the case of Newman v. New York, Lake Erie & Western R. R. Co., 54 Hun, 335, 7 N. Y. Supp. 560, where a railroad detective arrested a suspicious character who had purchased a ticket, and was waiting for the departure of a train. The prisoner was taken before a police magistrate and held, and the court held that the arrest might be justified under the circumstances disclosed by the evidence, and that the detention by the police magistrate could not involve the defendant in damages, even though the peace officer making the arrest was in its employ, so long as it was not shown that the prisoner was detained at the instance of the officer.

[4–6] The presumption prevails that the common law exists in each one of the states (Newman v. N. Y., L. E. & W. R. R. Co., supra), and at common law a felony has a well-known and definitive meaning. It is an offense which occasions a total forfeiture of lands or goods or both, to which capital or other punishment might be superadded (Fassett v. Smith, 23 N. Y. 252, 257), and it cannot be doubted that murder is a felony both under our own statutes and at common law. See People v. Lyon, 99 N. Y. 210, 216, 1 N. E. 673; section 2, Penal Law (Consol. Laws 1909, c. 40). Our statute does not require that the felony shall have been committed within this state, nor does the common law. The authority to arrest without a warrant is general in a peace officer "when a felony has in fact been committed, and he has reasonable cause for believing the person to be arrested to have committed it" (section 177, Code of Criminal Procedure), and people coming within this state have no right to complain if they are treated in the same manner that our own people are treated under the law.

In the case now before us the defendant railroad company took on passengers and undertook to carry them, subject to the laws of this state, to their destination. At Syracuse peace officers, acting under the law, came on board and interrupted the defendant in the performance of its contract, and it cannot, we believe, be held answerable to the plaintiffs in this action. It is not material even that there may have been no felony. The peace officers had apparent authority to make the arrest. It was a matter of common notoriety that a series of murders had been committed in the state of Indiana, and the perpetrator of these crimes was believed to be Mrs. Guinness. These peace officers told the defendant's conductor that they were after Mrs. Guinness, who was believed to be on car 1 and in berth 1, according to information received from the police department of Rochester, and the conduct of the conductor and other members of the train crew was in accordance with law, and involved no liability to the plaintiffs. This view is supported by Owens v. Wilmington & Weldon R. R. Co., 126 N. C. 139, 35 S. E. 259, 78 Am. St. Rep. 642, Brunswick & Western R. R. Co. v. Ponder, 117 Ga. 63, 43 S. E. 430, 60 L. R. A. 713, 97 Am. St. Rep. 152, Texas Midland R. R. v. D. Dean, 98 Tex. 517, 85 S. W. 1135, Bowden v. Atlantic Coast Line, 144 N. C. 28, 56 S. E. 558, and by reason and sound public policy.

Judgment for the defendant should be entered.

Exceptions overruled, and judgment directed for defendant, with costs.

JENKS, P. J., and RICH, J., concur. CARR, J., concurs in result in separate memorandum. THOMAS, J., reads for plaintiff.

CARR, J. I concur in the result for affirmance. I do not think it necessary to decide whether the police officers had legal power to make the arrest in question. They were known to be police officers, and I think it should have been presumed prima facie by the train officers that the police men were acting lawfully. If so, then there

was no breach of duty by the defendant to its passengers in failing to resist the attempted arrest. Doubtless, if the conductor had inquired, he would have learned that the police officers were acting without a warrant issued either by the Governor or a magistrate under the provisions of sections 827–829 of the Code of Criminal Procedure. If such information had been before him, as it was not, he was not then obliged to determine, at the risk of his employer, a question of law as to which the justices of this court are not in complete harmony. I do not find in this record any proof of such participation in the arrest by the conductor as to make him one of several joint tort-feasors. If there was such proof, then the question of the defendant's liability would have been for the jury to determine. Duggan v. B. & O. R. R., 159 Pa. 248, 28 Atl. 182, 186, 39 Am. St. Rep. 672; Mayfield v. St. Louis R. R. Co. (Ark.) 133 S. W. 168, 32 L. R. A. (N. S.) 525.

THOMAS, J. (dissenting). The question is whether there was such evidence of defendant's neglect to protect the plaintiffs, its passengers, from an unwarranted assault or participation therein as to require submission of defendant's liability to the jury. The seizure of two female passengers at Syracuse by two policemen was followed by holding them while the train proceeded to Utica, whence they were removed from the train and later returned to Syracuse, where they were later released. The policemen acted pursuant to a message from police headquarters at Rochester to the effect that there were two women on the train, the younger of whom was supposed to be Mrs. Guinness, who had committed murders in Indiana.

There was no basis whatever for the advice. There is not a fact that palliates the officers' conduct, nor one that shows the slightest effort on the part of the defendant's station agents at Syracuse, or the conductor, to discover the truth and to avert the indignity. Moreover, the station agent and the conductor countenanced by their presence the seizure of the plaintiffs, and, in addition, the conductor either led, or directed that the officers should be led, to the plaintiffs' berth, thereby identifying the passengers, and Mrs. Heeren testified that, after they had been compelled to vacate the berths, she said to the conductor:

"'I am not the woman that is wanted. Can't you do something for me?' I said. 'I am not the one. There is a mistake here.' And he said, 'You had better go along without any trouble.' I partly dressed the both of us, and the two men and the conductors of the train took us to the stateroom."

Mrs. Burton also testifies that in the stateroom the two conductors and porter were present for a part of the time while they were dressing. The evidence sufficiently shows that the conductor was informed at Syracuse that the arrest was for a crime committed in Indiana. The officers had no authority real or apparent to do the act, and the defendant's agents would not be excused in this instance if they did not know it. They were informed that the seizure was for a crime committed in the state of Indiana. Therefore they are not excused if in fact ignorant that a legal arrest could be made pursuant to the

Constitution (art. 4, § 2, subd. 2) and statute of the United States (R. S. U. S. § 5278 [U. S. Comp. St. 1901, p. 3597]) only by virtue of sections 827 and 829 of the Code of Criminal Procedure of the state of New York, wherein the process required is defined. The law gives the Governor of the state and a magistrate each the power to cause the arrest by a warrant issued. The fact and the applicable law were present to the conductor. He ignored both, and was contented with a mere emblem that denoted an officer, but carried no authority whatever. Had the conductor merely asked whether the officers had the Governor's or magistrate's warrant, he would have learned the truth, and, having learned the truth, he would have permitted without some intervention the removal at the peril of his employer. But there was no inquiry, and not a word of protest.

The defendant depends upon two positions: (1) That the intruders were policemen, and thereby appeared to have authority to arrest; (2) that the statute (Code Criminal Procedure, § 177), relating to crimes committed in this state, authorizing arrests without a warrant, apply to felonies committed in a foreign state. So the defense is apparent authority from the official status of the captor, and actual authority from the extraterritorial application of our criminal procedure. But the Code makes specific provision that for the arrest of those accused of crime done beyond the state the warrant of the Governor or a magistrate shall be obtained. The provisions of section 177 of the Code of Criminal Procedure are not extended to such case. Precisely how the arrest shall be made is written in the statute, to wit, by warrant served as our law requires. The whole criminal procedure is not assimilated, but there is interpolated in it an exact statement of what shall be done to authorize the arrests. This in itself excludes what in any case would be inapplicable to an extraterritorial offense.

This brings the question to what I deem the debatable point, namely, if a police officer would enter cars and seize a passenger, should the carrier admit him, and suffer the arrest without any inquiry or intervention, and may it with impunity countenance, encourage and aid the arrest to the extent above indicated. In deciding this, it must be considered that the policeman, although such, and as such competent to serve a warrant, has none; that he has no actual authority to make the arrest; that the carrier cannot plead ignorance of the law as a defense if it omit its duty. So the first proposition to be maintained by defendant is that an officer, known to be authorized to arrest only with a warrant, may without authority enter a car and capture passengers without any duty of protection on the part of the carrier—and this because the carrier must assume that the officer has full right to make the capture. A person justly recognizes the authority of an officer not from his official status, at least not from that alone, but because he appears to have the authority. He may appear to have it because he carries a warrant that gives legal color to his action, or because the law dresses him with authority to make the arrest without warrant. Now, when the officer acts under the color of authority, arising either from his papers or the provisions

of law, the carrier is not required to look behind such appearance of authority. But the naked fact that a person is an officer does not make him appear to have a warrant, nor to be competent to arrest without it. Whatever the law may permit him to do, he appears to the carrier authorized to do it. But in the present case no law casts upon the intruders such appearance, nor could it appear to the carrier to do so. The carrier was informed that the crime was committed in Indiana, and was bound to know that an arrest therefor without a warrant was illegal. There are decisions that police officers may arrest in a state passengers for crimes committed therein, and it need not or should not interfere. The conclusion is quite logical. The law in such cases authorizes arrest with or without warrant, and the carrier must respect a warrant if presented, or the apparent authority given by the statute or common law to arrest without it. The carrier need not consider whether the facts support the asserted exercise of authority, provided the officers appear to be acting within its general scope. But in the present case the carrier knew that the officers were not acting within the scope of such general authority, and it was bound to know that there was no law that protected the act which they were doing. In the one case the law so clothes the officer with power justly exercisable upon given conditions that he appears to the carrier enabled to act. It is not for the carrier to test the presence of the conditions. It is enough for it that they may exist. But here no such facts, real or apparent, existed or were asserted, but the carrier was told the facts by the officers that showed the latter to be wrongdoers. But, being told that the officers were about to do an illegal thing, the conductor let them enter the train and showed them, or caused them to be shown, the persons on whom they could perpetrate it, told the passengers that they had better submit, and accompanied the plaintiffs to the stateroom. There was no inquiry, after full opportunity for it, during 54 miles of travel, occupying 1 hour and 15 minutes before the passengers were finally removed. So the carrier, remaining not even passive, aided the undertaking as it did.

Had these same officers presented themselves to a conductor and showing their shields demanded freight, without such warrant or process as the law requires, its delivery would not be excused. Nickey v. St. L., I. M. & S. Ry. Co., 35 Mo. App. 79; Merriman v. Great Northern Exp. Co., 63 Minn. 543, 65 N. W. 1080. Seizure of goods by a police officer falls under the same rule. The law requires a written process in such case and in this case. So far the analogy holds. It is true that the goods are wholly committed to, and have no protection save through the carrier, maybe an insurer, while the passenger, transported under the carrier's obligation to use care against assaults, has some self-capacity to defend himself, or to submit, or to exercise other judgment. This goes to the degree of protection due to the passenger and the extent to which it should be afforded. But the present decision is that the carrier owes no duty and may facilitate the arrest notwithstanding an appeal to him for protection. The defendant's cars are the shelter to which it invites.

the passengers, the place where the latter are isolated from usual safe-guarding environments and opportunities. These cars a police officer unauthorized has no right to enter, and to them the carrier may not bid policemen nor suffer them to come to make false arrests without some intervention, and, above all, the carrier may not abet the entry and the capture. So, when an officer presents himself, the burden is on the carrier to demand the exhibition of his authority, and when it is not produced, and does not appear without exhibition, to use practicable care to protect the passenger, as it would against any other assault, for it is only that. It is either this or an unconditional recognition of the right of any officer to do anything he will in the seizure of passengers or their property, suffered, or permitted thereto by the carrier.

I will now discuss more particularly the participation of the carrier through its agent in the arrest. The defendant had the plaintiffs in his charge as passengers, and allotted to them seats and berths in the car for the purposes of transportation and as an abiding place during its continuance. Two men came to make an unlawful removal of such passengers. The carrier's agent was advised of the purpose, and was bound to know that it was unlawful. He did not concert the plan for the seizure, but he did (1) consent to it by giving leave to the men to enter the car; (2) he conducted them to the car, or caused them to be so conducted; (3) he led or caused them to be led to the plaintiffs' berth for the purpose of identification; (4) he and others connected with the carriage stood by while the seizure was made; (5) the conductor when appealed to for protection told the passengers that they had better go along without any trouble, which, in view of the relations, is more in the nature of a command than of advice; (7) he suffered the passengers to be carried in charge of the officers to Utica, and there removed. These acts and omissions, in gross at least, show that the carrier consented to the illegal act, encouraged it by adding it, and thereby tended to bring about the unlawful result. Whoever by words, acts, gestures, looks, or signs so encourages and aids the commission of a tort is a joint tort-feasor. McMannus v. Lee, 43 Mo. 206, 208, 97 Am. Dec. 386; Cooper v. Johnson, 81 Mo. 483; Smith v. Felt, 50 Barb. 612. So the wrongful act was done by defendant's co-operation, and tended naturally to effectuate the illegal errand. Brooks v. Ashburn, 9 Ga. 297, 302. This is not a case where the accused party, having no duty to restrain illegal aggressions, merely licenses, so far as he is concerned, a wrong-doer to enter upon premises or to use facilities. In Robinson v. Vaughton, 8 Carrington & Payne's Reports, 252, it was considered that, if A. gives B. leave to go on a field in which he has no right, A. is not liable for B.'s trespass thereon; but otherwise if A. orders and authorizes it. But in the case at bar the defendant not only licensed or permitted the men to go on its car to do an act, which it was bound to know was illegal and which was the initial breach of its duty to the passenger, but by direct interposition aided in the seizure. Hence it not only against its duty countenanced the commission of the tort, but affirmatively aided it. Moir v. Hopkins, 16

Ill. 313, 315, 63 Am. Dec. 312. In Hill v. Walker, Peake's Additional Cases, 234, several persons were engaged in a common hunt. Lawrence, J., said:

"The defendant having purposely led the rest of the party to this place, and waited while they went into it, he was equally guilty of a trespass as if he had personally gone or sent his own dog into it."

I consider that the liability would have been the same had the defendant joined the party at the field and shown the way for the purpose of effectuating the purpose, knowing it to be unlawful. Such at least would be the case if a crime, like an assault, were committed. In Allred v. Bray, 41 Mo. 484, 487 (97 Am. Dec. 283), it was said:

"There seems to be no principle of law better settled than that all persons who wrongfully contribute in any manner to the commission of a trespass * * * are responsible as principals. * * * It is unnecessary likewise to show what degree of efficiency he exhibited in giving aid and countenance to those who actually broke into the store and took the plaintiff's goods. It is enough if he was found to be acting in concert with the others. * * * If he was present at any time during the commission of the wrongful act, giving aid and countenance to it, he should be held liable to the extent of the injury done."

In Carter v. Fulgham, 134 Ala. 238, 32 South. 684, it was stated that if one Jamar aided Holmes, an officer, in the seizure of plaintiff's property, "by locating and pointing out" the same, "for the purpose of their being taken, and for which he was to receive compensation, and the taking * * * by Holmes was wrongful, then Jamar was a joint tort-feasor." I consider that it is unnecessary that a person assisting in a tort or a crime should be entitled to compensation in money for his participation in order to charge him as a joint wrongdoer. If it be the law that a carrier may hold himself aloof when a peace officer seizes its passengers, its attitude cannot be regarded as merely passive where in any degree it facilitates the act.

Thus far the case of the mother has been considered as identical with that of the daughter. But the officers on the trial disclaimed any direction or even intention to seize the mother, and made no pretense that they made any demand for her from the carrier. Their position now is that they did not want the mother, but that she went voluntarily. But there is sufficient evidence that she was seized and carried away against her will. It was not until the berth was opened that the relationship of the plaintiffs was disclosed, and it was on account of that, and her association with the daughter, that she was apprehended. Any other passenger might have been taken with equal right. There was no authority to take either. But, as to the mother's case, the situation is this: That the officers for the mere reason that they were such were allowed to seize a passenger against whom no crime was charged, for the sole reason that she was traveling with a person for whom they were searching. Therefore, if the judgment in the mother's case has been correctly decided, the carrier owes no duty to protect its passengers against officers who, coming upon the train to seize one person, also capture her relative and traveling com-

panion. The weight of the evidence does not now concern the inquiry, nor how far the carrier should have carried its protection. It afforded none. It withdrew what it had been extending, and joined in the illegal enterprise.

For the reasons stated, my conclusion is that there should have been a submission to the jury in each action.