## MURPHY v. NEW YORK & CUBA MAIL S. S. CO.
## LALLY v. SAME.

(Court of Appeals of District of Columbia. Submitted January 4, 1921. Decided April 4, 1921.)

### Nos. 3386, 3387.

1. **Shipping ⚖⇒166(1)—Steamship company's duty extends to all passengers.**
   In connection with an alleged theft of jewels on board a steamship and a search of the staterooms of certain passengers by police officers at the port of destination, the carrier's duty extended, not only to the suspected persons, but to the passenger alleging the theft, and to the larger body of passengers not involved in the controversy, who might have been endangered or delayed by any resistance to, or obstruction of, the investigation.

2. **Shipping ⚖⇒166(1)—Captain not bound to prevent transmission of radiogram asking officers to meet ship, or inform suspected persons.**
   Where the captain of a steamship bound for Havana, to whom complaint was made of an alleged theft of jewels, refused to order a search of the passengers or of the staterooms of suspected persons, he had neither the right nor the duty to prevent the complaining passenger from sending a radiogram to the Havana police officers, asking them to meet the ship, and was under no duty to inform the suspected persons that such message had been sent.

3. **Evidence ⚖⇒317(2), 593—Statement of police officer that search was by permission of steamship captain held hearsay.**
   The statement of a police officer, while searching the stateroom of a steamship passenger suspected of theft, that he was there by permission of the captain, was hearsay, and could have no probative force against the captain, who was not present when it was made, and was dead when it was repeated at the trial.

4. **Shipping ⚖⇒166(5)—Evidence held not to make question for jury as to captain's consent to search of stateroom by police officers.**
   Where there was testimony that a steamship captain refused police officers at the port of destination permission to search the staterooms of passengers suspected of theft, but the police officers nevertheless made a search, evidence *held* insufficient to make a question for the jury as to whether the captain gave permission for the search, especially where the case was presented to, and decided by, the trial court on the theory that permission was refused.

5. **Shipping ⚖⇒166(1)—Passenger, after reaching destination, held not member of ship's company, bound only by law of ship's sovereignty.**
   Where a ship had reached her destination, and her passengers were about to disperse in various directions, and passengers suspected of theft declined to tell police officers where they intended stopping, they could not be regarded as members of the ship's company, whose internal discipline was a matter for the law of the sovereignty of the ship, but, like the ship, owed allegiance and obedience to the laws of the port, subject to any existing treaty rights.

6. **Shipping ⚖⇒166(1)—Captain of steamship held not bound to resist search or arrest by police officers on complaint.**
   Under the Cuban law, requiring every citizen to notify the police of any crime within his information, and requiring the police authority to investigate such information, where the police at Havana, to which port a steamship was bound, were notified of an alleged larceny, the agents of the steamship company were not bound to substitute their opinion of Cuban law for that of the officials, or resist the officers in searching the

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

273 F.—20

staterooms of suspected persons, and in arresting them, even assuming that United States statutes and the treaty between United States and Cuba gave the suspected persons, as American citizens, a right to be tried in the United States.

Smyth, Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Two actions, by Josephine Murphy and by Anna V. Lally, against the New York & Cuba Mail Steamship Company. From judgments on directed verdicts for defendant, plaintiffs appeal. Affirmed.

F. J. Hogan and Leo P. Harlow, both of Washington, D. C., for appellants.

F. D. McKenney, J. S. Flannery and G. B. Craighill, all of Washington, D. C., for appellee.

HITZ, Acting Associate Justice. These are appeals from judgments of the Supreme Court of the District of Columbia upon verdicts for the defendant, directed by the court at the close of all the evidence. The two cases were consolidated for trial by order of the trial court, and are presented together here by stipulation of counsel.

The plaintiffs below—appellants here—are American citizens and residents of the District of Columbia, who were passengers for hire of the defendant company upon a voyage from New York to Havana, beginning on October 25 and ending on October 29, 1913. The defendant is a corporation of the state of Maine, and a common carrier of passengers between New York and Havana.

On October 25, 1913, the plaintiffs, accompanied by a third lady and unaccompanied by any male escort, sailed from New York on the defendant's steamship Havana, together with some 137 other first-class passengers, consisting of men, women, and children of various nationalities, and including one Smith, general agent of the defendant company in Havana. The crew of the ship numbered about 130 men, including operators for the wireless telegraph instruments, with which the ship was equipped; the vessel making no stop and entering no port between New York and Havana. This party of three ladies occupied all of stateroom numbered 1 and a portion of stateroom numbered 2.

On the night of October 27, while the ship was off the American coast or on the high seas, a Cuban woman passenger complained to officers of the ship concerning the alleged loss or larceny of certain jewelry. On the morning of October 28, while the ship was off the coast of Florida, the steward mentioned to the plaintiff, Miss Lally, an alleged theft of jewelry aboard the ship; while later on the same day a Cuban woman passenger spoke to both plaintiffs regarding the same occurrence.

In the afternoon of October 28, the Cuban woman passenger complained to the captain of the loss or theft of her jewelry from the lavatory of the ship, requesting him to have all the passengers searched for her jewelry. This the captain refused to do. Then the Cuban woman asked the captain to have the American women in stateroom

numbered 1 searched, as she suspected them in connection with the disappearance of her jewels, because one of them was in the lavatory at the time they disappeared.  This the captain also refused to do.

Thereupon the Cuban woman told the captain that, if he did not have the plaintiffs searched, she would send a wireless message requesting the Cuban police to meet the steamer in Havana, which the captain stated he could not prevent her from doing.  Thereafter a wireless message was sent by two Cuban women to the secret police of Havana, concerning an alleged theft aboard the ship, the text of which message is not in the record.

The wireless operator testified that he had signed the ship's articles, considered himself a member of the crew, and subject to the captain's orders regarding the dispatch and receipt of messages, but that he did not call the captain's attention to the message in question, which was in the Spanish language and not clearly understood by him.

On the morning of October 29 the ship reached Havana, and while anchored in the harbor, before docking, was boarded by the port police, armed and in uniform, who requested permission of the captain to search certain staterooms in connection with an alleged larceny of jewelry.  The captain refused permission for this search, he being then on the bridge and engaged in docking the ship.

The police officers thereupon left the bridge, went into the saloon, where the plaintiffs were pointed out to them by the Cuban woman, and shortly thereafter the police obtained access to the plaintiffs' stateroom, which the plaintiffs had left locked and unoccupied, placing the key on a ledge outside the door.  The police then searched this room, together with the hand luggage of the plaintiffs therein.

The plaintiffs being informed by a steward that police officers were in their room, they returned there, found the key missing from the ledge, the door locked, and the Cuban police in the room.  The plaintiffs protested to the police against the search and invasion of their room, and, when asked by the police where they intended stopping in Havana, declined to tell saying they had been sufficiently insulted already, and did not want their friends ashore insulted.

Plaintiffs then appealed to the captain for protection, going to him on the bridge, and telling him of the search of their room, and that they considered themselves to be under arrest.  The captain replied that he could do nothing for them, but would meet them at the office of the American consul at noon.  Thereupon the plaintiffs left the ship, apparently accompanied by the police officers, and found their Cuban friends on the dock, who protested vigorously against the action of the police.

Plaintiffs were then taken to a small building on the dock, where they were separately searched by a matron of the custom house; the custom house and the port police having offices on the same dock as the defendant company.  After being so searched, an examination of a quasi judicial character was conducted by the police officers on the dock; plaintiffs being questioned as to any knowledge of the missing jewelry.

At the conclusion of this examination, and after being detained several hours, the plaintiffs were released and went to the American consulate at noon, where they were met by the captain of the ship, and where they made complaint against the Cuban police. On October 30, the captain of the ship sent to the captain of the port a written protest against the action of the officers, while a day or two later the plaintiffs were summoned to appear in a court of the city of Havana, where they were questioned concerning the missing jewelry, after which they were finally dismissed from the matter; nothing in the investigation having developed any guilt in the plaintiffs or their companion.

The plaintiffs complained to the American consul general and to the American minister of their treatment in the matter, which was called to the attention of the Cuban government, and which produced a letter of apology from the President of Cuba to the American minister, stating that the police officers had acted inadvisedly.

The various occurrences above related took place in the presence of sundry persons on the ship and on the dock. These cases are based on the alleged negligence of the defendant company in respect of its contract of carriage with the plaintiffs.

[1] The carrier's duty to its passengers, of course, extends equally to all its passengers, as well to the Cuban woman, alleging theft of her jewels, as to the American women, suspected of stealing them, and to the larger body of passengers not involved in the controversy, but who might have been endangered or delayed, if the officers of the ship had undertaken to resist or obstruct the investigation of the occurrence by the Cuban police at the instance of a Cuban citizen.

[2] The appellants first contend that the captain was guilty of negligence in not preventing the Cuban woman from sending the radiogram to the Cuban police, after putting him on notice that she intended doing so. Laying aside the fact that the captain had no knowledge of the actual sending of such a message, or of the contents thereof, we are of opinion that he had neither the right nor the duty to prevent its transmission in the circumstances.

The alleged theft was complained of to him by one of his passengers, who stated her suspicions of another passenger. He was asked to investigate the occurrence and make search for the goods, and when he declined to do so he could not, consistently with his duty to both these passengers, undertake to prohibit the Cuban woman from informing the Cuban police authorities at the first port which the ship should reach of the alleged crime and any grounds of suspicion which she entertained concerning it. Nor was it the duty of the captain to ascertain that such a message had been sent, and to inform the suspected persons thereof, which would only have enabled them, if guilty, to destroy the evidence of guilt and defeat the ends of justice.

While the text of the radiogram is not in evidence, it is clear from the record that a message was sent by the Cuban woman to the Cuban police, informing them of the alleged loss, requesting them to meet the ship in the harbor of Havana to investigate the occurrence, and that when they did so she pointed out to them the plaintiffs as the persons

she suspected, and whose stateroom she knew. For any mistake of fact or abuse of power on the part of the Cuban woman or the Cuban police, they, or the Cuban government, might well be responsible; but the endeavor to hold the carrier liable in this proceeding is a very different matter.

The appellants next contend that the appellee was guilty of negligence in respect of the search of the appellants' stateroom and their subsequent arrest by the Cuban officers; the second assignment of error being the refusal of the trial court to submit to the jury the issues of fact presented by the testimony. But the only resemblance to an issue of fact that we perceive in the record concerns the request of the Cuban police to the captain of the ship for permission to search the stateroom.

Under the Cuban Code, before a foreign ship may be judicially searched, permission therefor must be obtained from the captain of ship or the consul of his nation. Code of Civil and Criminal Procedure for Cuba and Porto Rico, § 561, Washington Edition, January, 1901. It is admitted that no request was made to the American consul for permission to search the ship, and that the captain died before the trial and without his testimony having been taken.

In the argument in this court it was assumed on both sides that the captain, when requested to permit the search of the appellants' stateroom by the police, refused his permission, but did nothing further to prevent such a search, or to enforce his refusal. This assumption was presumably based, in large part, on the testimony of the third officer, who was on the bridge with the captain when the police made their request, and on the captain's letter of protest to the superior police authorities against the action of the boarding officers, which was written on the day after the occurrence, and which was read into the record by the appellants.

[3] In the narrative of the proceedings below, presented by the record printed for this court, one or both of the appellants is stated to have testified that, when they returned to their stateroom and found the police in possession thereof, one of the officers said that he was there by permission of the captain. But any such remark was but the hearsay statement of a wrongdoer in justification of his wrong, and could have no probative force against the captain, who was not present when it was made, and who was dead when it was repeated at the trial.

[4] This narrative account of the trial below further states that the three ladies involved in the occurrence, after their room had been searched, after they had been placed under arrest, and while they were greatly excited, if not somewhat hysterical, went to the captain on the bridge, accompanied by one of the police officers as far as the steps of the bridge, and complained to the captain of what had been done by the police, asking his protection and assistance. These witnesses agree that the captain told them he could do nothing to help them at that time, but would meet them at the American consulate at noon.

One of these witnesses testified that the captain said that, if the same thing had happened to his own wife, he would have had to permit it; another testified that he said it was an unfortunate affair, and if his own wife was in the same fix she would have to submit; while the third testified that she could not remember what the captain told them, except that he could not help them at that time. None of these witnesses undertakes to report the precise words used by the captain, while, in view of the hurried and excited character of the conversation and the lapse of more than six years between the occurrence and the trial, it would not be reasonable to expect such a repetition.

We cannot, therefore, regard this testimony as presenting a disputed question of fact as to whether or not the captain gave his permission for the search of the room. Furthermore the case was presented to and decided by the trial court on the same theory—that the captain refused the police permission to search the stateroom on their request, but that they thereafter surreptitiously gained access to the room and made the search in disregard of the rights of the ship, of the appellants, and of certain requirements of the Cuban law.

Indeed, the opinion of the trial justice, read by him before directing the verdict, and received by both sides without exception, states that the captain refused the police permission to search the stateroom, and that he was entitled to assume that they would not attempt a search in the face of his refusal, unless he was put on notice to the contrary, which there was nothing in the evidence to indicate. The trial court further states that there was no serious dispute as to what took place, from the beginning of the occurrences complained of to the end; while counsel for the appellants stated that all the facts were so clearly established by the evidence that he would have been justified in asking for a directed verdict for the appellants as a matter of law. Consequently we hold, upon the evidence and the arguments, that the captain refused the police his permission to search the room when they asked for it.

[5] At the time of the search of the appellants' room, and of their subsequent arrest, the ship had reached her destination; her numerous passengers were about to disperse in various directions, and when the plaintiffs were asked by the police where they intended stopping in Havana they declined to state. Under these circumstances these passengers, of course, cannot be regarded as members of the ship's company, whose internal discipline is a matter for the law of the sovereignty of the ship. In the language of the Supreme Court of the United States:

"Disorders which disturb only the peace of the ship or those on board are to be dealt with exclusively by the sovereignty of the home of the ship, but those which disturb the public peace may be suppressed, and, if need be, the offenders punished by the proper authorities of the local jurisdiction. And it may not be easy at all times to determine to which of the two jurisdictions a particular act of disorder belongs." Wildenhus Case, 120 U. S. 19, 7 Sup. Ct. 385, 30 L. Ed. 565.

And the same court in the same case quotes with approval from the Court of Cassation of France:

"Considering that merchant vessels entering the port of a nation other than that to which they belong cannot be withdrawn from the territorial jurisdiction, in any case in which the interest of the state of which that port forms part finds itself concerned, without danger to good order and to the dignity of the government; considering that every state is interested in the repression of crimes and offenses that may be committed in the ports of its territory, not only by the men of the ship's company of a foreign merchant vessel towards men not forming part of that company, among themselves, whenever the act is of a nature to compromise the tranquility of the port, or the intervention of the local authority is invoked." Wildenhus Case, 120 U. S. 19, 7 Sup. Ct. 385, 30 L. Ed. 565.

But these passengers, like the ship herself, owed allegiance and obedience to the laws of the port to which they had voluntarily resorted, subject to any existing treaty rights.

"It is part of the law of civilized nations that, when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless by treaty or otherwise the two countries have come to some different understanding or agreement." Wildenhus' Case, 120 U. S. 11, 7 Sup. St. 387, 30 L. Ed. 565.

[6] Now, by the Cuban law, every Cuban citizen is required under penalty to notify the Cuban police authority of any crime within his information, and such police authority is required to investigate such information and to collect all effects, instruments, and evidences of such crime. Law of Criminal Procedure for Cuba, Edition of 1901, as Reprinted by U. S. War Department, arts. 259, 262, 282, 290.

The crime alleged to have been committed on this ship occurred two days after she left her last port, and two days before her arrival in Havana, and at a point undisclosed by the record. Whatever may have been the common-law doctrine in England and America concerning the "ambulatory character" or "continuing offense" of larceny committed on the high seas, in both jurisdictions such larceny has long since been made a continuing offense by statute. St. 13 George III, c. 31, § 4; St. 7 George IV, c. 29, § 76; U. S. Penal Code, §§ 287, 288 (Comp. St. §§ 10460, 10461); U. S. Judicial Code, §§ 41, 42; 36 Statutes at Large, p. 1100 (Comp. St. §§ 1023, 1024); Perara v. U. S., 221 Fed. 213, 136 C. C. A. 623; Morris v. U. S., 229 Fed. 516, 143 C. C. A. 584; 2 Moore, Internat. Arb. 249, 250.

If the statutes of the United States and the treaty between the United States and Cuba give an American citizen, charged with having committed larceny from a Cuban citizen upon an American vessel on the high seas, a right to be tried in the United States, notwithstanding his entry and arrest at a Cuban port, upon which we express no opinion, we are aware of no provision of law which prohibits the Cuban police authorities, on the complaint of a Cuban citizen, from making a preliminary investigation into such an alleged larceny or from holding the accused person for trial or extradition in due course. On the contrary, such an investigation, promptly conducted, while witnesses and evidence are available, is advantageous to the course of justice and beneficial to all parties concerned.

The record shows that the search of the stateroom and the arrest of the plaintiffs was done by three or four known officers of the port police, armed and uniformed, after the ship had anchored in the port. The Cuban friends, whom the appellants had come to Cuba to visit, were on the dock; legal counsel was obtainable in Havana; American consular and diplomatic officers were available there; and the agents of the defendant company owed no duty to the appellants to resist known officers of the port, or to attempt to substitute their own opinion of Cuban law for that of Cuban officials.

So, where a negro, riding in a Pullman car as an interstate passenger through a state having a separate car statute, was wrongfully ejected and arrested by local police officers, although notice of his presence in the car had been telegraphed ahead to the police by the train conductor, to the knowledge of the Pullman conductor, who made no protest or objection to the arrest of his passenger, it was held by the Circuit Court of Appeals for the Eighth Circuit that it was the—

"duty of the Pullman Company to exercise reasonable care and diligence to protect the passengers in its cars from unlawful discomforts, attacks, inconveniences, insults, and injuries; but that duty did not require it or its employees to substitute their opinion of the law and of the duty of officers of the law for the judgment of the latter, and to interfere with and obstruct the discharge by these officers of their duties, and the failure of the Pullman Company and its employees to obstruct, interfere with, or prevent the arrest or removal of the plaintiff from the Pullman car by the deputy sheriff did not constitute actionable negligence." Thompkins v. Railway Co., 211 Fed. 394, 128 C. C. A. 1, 52 L. R. A. (N. S.) 791; Burton v. Railroad Co., 147 App. Div. 557, 132 N. Y. Supp. 628.

If the Cuban officials were mistaken in fact or in law, they or their government may well be responsible to the injured parties in a proper procedure. But, concluding, as we do, that there was no actionable negligence on the part of the appellee's agents disclosed by the record, and the essential facts being established by uncontradicted evidence, there was no question presented which the trial court could properly have left to the jury, and "to allow them to substitute sympathy for evidence" is reversible error. Southern Pacific Co. v. Berkshire (decided January 3, 1921) 254 U. S. 415, 41 Sup. Ct. 162, 65 L. Ed. —; Barrett v. Railway Co., 250 U. S. 473, 39 Sup. Ct. 540, 63 L. Ed. 1092; Butler v. Frazee, 211 U. S. 459, 29 Sup. Ct. 136, 53 L. Ed. 281.

The judgments are affirmed.

Mr. Justice HITZ, of the Supreme Court of the District of Columbia, sat in the place of Mr. Justice ROBB in the hearing and determination of this appeal.

SMYTH, Chief Justice (dissenting). Certain propositions are admitted or established in this case: (a) That it was the duty of the company, being a common carrier, to protect the appellants as passengers as far as practicable (New Jersey Steamboat Co. v. Brockett, 121 U. S. 637, 645, 7 Sup. Ct. 1039, 30 L. Ed. 1049; Washington Railway Co. v. Perry, 47 App. D. C. 90, 97); (b) that the appel-

lants, being highly respected persons, were inconvenienced, insulted, humiliated, and their stateroom and luggage searched against their will by Cuban police officers, while they were on board the appellee's ship, on the false assumption that they had committed larceny; (c) that the Cuban officers had no right to search the stateroom of the appellants without the permission of the American consul or of the captain of the vessel; and (d) that the consul had not given permission.

The law of the Republic of Cuba, found in the record, governing the right of a Cuban officer to search any of the places mentioned therein, says, in section 561:

"Nor can he enter and search foreign merchant vessels without the authority of the captain, or, if the latter should refuse it, without that of the consul of his nation."

The statute makes it clear that the Cuban officers had no right to search the company's vessel without the permission of the captain or consul. This also accounts for the officer's request for permission to make the search. There is no claim that the American consul gave his permission, or was asked to do so.

Did the captain give permission? The opinion asserts that he did not. Let us see what the record says. The captain died some time after the occurrence, and this perhaps explains why his testimony was not taken. One of the ship's officers testified that the captain positively refused to grant the Cuban officials permission to search the stateroom, and he is the only one who says so; but there is testimony in conflict with this. The two appellants said that, when they called upon the captain for protection after their stateroom had been searched, he received them in his shirt sleeves, in his quarters on the bridge, remained seated during the interview, displayed much indifference, and stated that, if it had been his own wife, "he would have had to permit it." Does this not tend to show that he did permit it in the case of the appellants? His attitude was that of a person who was not much concerned in extending to them the protection to which all passengers are entitled at the hands of their common carrier.

Is it not unlikely that the Cuban officers, knowing as they must have the law of their own nation, would, if the captain had refused permission, go directly to the stateroom in the presence of the many who stood about, open the door, and enter on a vigorous search of the appellants' effects? The stateroom steward was nearby and saw what took place, for he informed the appellants of it. The Cuban officers gained entrance to the stateroom by means of a key which they had found on a ledge above the door, where the appellants were accustomed to place it. This was known to the steward. How did the Cuban officers learn of its location, unless he informed them? Is it likely that he would have done so, unless he had assurance that the captain had given the officers permission to make the search? Finally, both appellants testified that, when they entered the stateroom and found the Cubans at work, the captain of the Cuban force said in answer to their protests: "This is by the captain's permission." Nei-

ther the steward, the Cuban police captain, nor any one else was called to contradict this. It is said the testimony is secondary. Granted. But no objection was made to it on that ground or on any other. If the appellee was satisfied with it the court should be. Had timely objection been made, the Cuban officers could have been called. They were competent to testify to what the captain had said to them. But we are told that it was assumed in the argument that the captain did not give his permission. There is no admission of that character in appellants' brief, and the record clearly presents the question, as it does all other questions affecting the sufficiency of the evidence to carry the case to the jury. I submit that the testimony and the circumstances made it a clear question for the jury as to whether or not the captain had given permission for the search.

Assume that it had been left to the jury, and that they had found that the search was made with permission of the captain, could there be any doubt that the company which the captain represented is liable for all the consequences of the permission? Certainly it could not be said with any show of reason that, in giving permission to do the thing which caused the injury, the carrier was doing all that was practicable for the protection of its passengers.

Even if it was established that the captain had refused permission, but did nothing more, it would be, it seems to me, for the jury to decide whether he had thereby performed his full duty in the circumstances. He knew the accusations that had been made against the appellants, and knew what the officers were on board for. Might not the jury have said with reason that, knowing these things, he personally, or by some proper person deputed for the purpose, if his duties kept him on the bridge, should have observed the Cuban officers while on board, and taken every step reasonably available to persuade them that they had no authority to make the search, and that, if they attempted it, they would be held to strict accountability for their act? If he had done this, the jury would be justified in saying, considering all the circumstances, that the officers would not have made the search, abused the appellants, and otherwise disobeyed the law. The question of the proximate cause of an injury is ordinarily not one of science or of legal knowledge, but a fact for the jury to determine, in view of all the accompanying circumstances. Milwaukee & St. Paul Railway Co. v. Kellogg, 94 U. S. 469, 474, 24 L. Ed. 256; In Washington Railway & Electric Co. v. Perry, 47 App. D. C. 90, this court said that the trial court made no error in leaving to the jury the question as to whether or not the conductor's failure to take any steps to quiet the boys who were misbehaving on his car was the proximate cause of the injury of one of their fellow passengers. See, also, in this respect, Anania v. Norfolk & Washington Railway Co., 77 W. Va. 105, 87 S. E. 167, L. R. A. 1916C, 439; Hutchinson Carriers, 3rd Ed., sec. 1162; Mary A. Smith v. Wilson, 31 How. Prac. (N. Y.) 272 Fed. Cas. No. 13,128; Parsons on Shipping and Admiralty, 636; Louisville & Nashville Railroad Co. v. Byrley, 152 Ky. 35, 153 S. W. 36, Ann. Cas. 1915B, 240; Southern Railway Co. v. Hanby, 183 Ala. 255, 260, 62 South. 871.

Moreover, there is nothing whatever in the evidence indicating that the police officers would have persisted in making the search if the captain had shown any opposition. They apparently were proceeding under the assumption that they had his authority and were acting entirely within the law.

There is no analogy between this case and cases like Burton v. N. Y. C. & H. R. R. Co., 147 App. Div. 557, 132 C. C. A. 628, and Thompkins v. Railway Co., 211 Fed. 391, 128 C. C. A. 1, 52 L. R. A. (N. S.) 791, where an officer, clothed with apparent authority makes an arrest or a search. It is no part of the carrier's duty, so say most of the authorities, to oppose such an officer. Here there was no question of apparent authority. The Cuban statute makes it indisputable that the officers had no authority without permission of the captain or the consul; and the captain knew this. Stress is laid on the Wildenhus Case, 120 U. S. 1, 8, 7 Sup. Ct. 385, 30 L. Ed. 565, but it is not in point. There the court decided what the law of nations was with respect to the facts before it. Here we have no such question. The matter is governed by a Cuban statute which fixed the authority of the Cuban officers.

We have nothing whatever to do with the question as to whether or not larceny is an ambulatory offense, although I may say in passing that this court in a well-considered and exhaustive opinion held that it was not. Brown v. United States, 35 App. D. C. 548, Ann. Cas. 1912A, 388. No note is made of that decision in the opinion. How are the bench and bar to regard it in the future—as overruled or as still the law of the District? Be that as it may, even if the alleged larceny was committed on the ship in the harbor, the Cuban officer could not have searched the stateroom without permission. No exception is made by the Cuban statute.

It is hardly necessary to add that, in determining whether or not this case should have been withdrawn from the jury, we must construe the evidence in the light most favorable to the appellants. Thos. R. Riley Lumber Co. v. McHarg, 47 App. D. C. 389, 399, and cases there cited. Applying that rule, I am convinced that the court erred in peremptorily instructing the jury, and that a new trial should be ordered.

Hence I dissent.