CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY *v.* BROWN.

Opinion delivered February 2, 1914.

1.. CARRIERS—DUTY TO PROTECT PASSENGERS.—Carriers are not absolute insurers of the safety of their passengers. (Page 298.)

2.. CARRIERS—INJURY TO PASSENGER—DUTY TO PROTECT.—A railway company will not be liable in damages to a passenger who is injured by being pushed off a moving train in the excitement attendant upon a shooting duel between two other passengers, when the train crew had no knowledge of the impending trouble, and after the trouble started did not fail to exercise the proper means to prevent an injury to the plaintiff. (Page 298.)

Appeal from Jackson Circuit Court; *R. E. Jeffery,* Judge; reversed.

STATEMENT BY THE COURT.

The complaint in this case alleges that on the 19th day of August, 1911, plaintiff's wife, Hallie Brown, was

a passenger on defendant's train from Brinkley to New-
port; that she was seated in the fourth seat from the
front in the rear car of said train, and that one F. H.
Kennedy boarded said train and was seated in the third
seat from the rear of the same coach; that said train
proceeded on its course from Brinkley until its arrival
at Saulsburg, where one R. C. Lynch boarded the train
and seated himself on the seat immediately in front of
the said Hallie Brown; that before said date the said R.
C. Lynch and F. H. Kennedy had a shooting scrape and
were bitter enemies, and a tragedy was likely to occur
at any time upon their meeting, and that this fact was
well known to defendant and its employees.   It alleged
that as soon as the said R. C. Lynch became settled in
his seat, the said F. H. Kennedy began to shoot at him
with a deadly weapon, and, notwithstanding the conduc-
tor of the train was in the rear part of said coach, within
easy reach of the said F. H. Kennedy, he made no effort
to restrain the said Kennedy or to disarm him, but per-
mitted him to pass up the aisle, shooting at the said
Lynch, and the said Lynch in turn shooting at the said
Kennedy; that the said Hallie Brown was in direct range
of the bullets from the guns or pistols of the said Lynch
and Kennedy; that she abandoned her seat and went to
the rear of the coach to get out of the range of the bul-
lets and out of danger, as she thought.   That a panic
then ensued among the passengers, and the agents and
employees of the said defendant made no effort to stop
the affray or prevent it, or quiet the passengers, though
they had ample opportunity to do so, but abandoned the
passengers to their fate; that the auditor jumped off of
said train and abandoned it, and that the conductor hid
behind a seat; that during the panic some one on the
train ran to the rear of the coach, and in his eagerness
to get off pushed the said Hallie Brown out of the coach
and off of the train, while it was in motion and run-
ning at a rate of speed of about fifteen miles per
hour, inflicting serious and permanent injuries; that by
reason of said injuries plaintiff was deprived of the ser-

vices and companionship of his wife, and was put to great expense for medical attention, etc., to his damages in the sum of three thousand dollars

The answer specifically denied all the material allegations of the complaint.

The plaintiff recovered a judgment which is not said to be excessive, but the appellant railroad company says that under the proof it is not liable in any sum, and this is the only serious question raised by this appeal.

Appellee asked only two instructions, the first of which defined the duty of the carrier to protect its passengers, and the second instruction was on the measure of damages.

The first instruction reads as follows: "You are instructed that it was the duty of the defendant, its agents, servants and employees in charge of its train, at the time of the difficulty mentioned in the evidence after said difficulty became known to them, to exercise an ordinary degree of care and effort to stop said difficulty, and thereby protect its passengers on said train from injury or damages that might result to them from said difficulty, and also to prevent injury to its passengers by the acts and conduct of other passengers while said difficulty was in progress, and you are instructed that if defendant, its employees, agents and servants failed to exercise such degree of care, and that by reason of said failure so to do, and as a result of said failure, plaintiff's wife was injured and plaintiff lost her services and companionship, and was occasioned expenses in treating her for said injuries thereby, your verdict should be for the plaintiff."

Appellant admits that instruction No. 1 correctly states its duties to its passengers generally, and to Mrs. Brown in particular, but urges that the evidence does not show any breach of that duty.

There is no serious conflict in the evidence, and no attempt was made to show that any employee of the appellant had any knowledge of the probability of trouble occurring between Mr. Lynch and Mr. Kennedy. Upon

that question appellee states in his brief: "It is not here charged that appellant's employees had previous knowledge, but that they were negligent, in that they failed to exercise even ordinary care after they actually saw the beginning of the difficulty." The shooting occurred just as the train left the station of Saulsburg, and one witness estimated that it had gone fifty or seventy-five feet when the first shot was fired, and others that it had gone about 150 feet from the station when the difficulty began, and the train had probably run three or four hundred yards from the station before it stopped. Mr. Kennedy was on the train before it reached Saulsburg and was sitting in the last seat in the rear coach on the left-hand side and on the seat with him was his son, F. H. Kennedy, Jr., who with his father were facing north, the direction in which the train was going. Another young man and Mr. Kennedy's daughter were facing them on the next seat which had been turned back for that purpose. Mr. Lynch got on the front platform of this chair car, which was the rear car, and a Mr. Gillespie, who was the auditor, got on just in front of him and a Mr. Sanders, who was the brakeman, got on the same platform behind the other two, and the brakeman testified that he crossed over from this platform to the coach in front, which was the smoker or Jim Crow car, and that he was going toward the baggage car when the shooting began. The brakeman testified that he did not know where the auditor was, and the auditor himself did not testify and explain his whereabouts, but we assume appellee's contention is true that the auditor left the train as soon as the shooting commenced, before the train had acquired any considerable speed.

As soon as the shooting commenced, several of the passengers, including Mrs. Brown, ran toward the rear of the coach, and the conductor estimates the number who did so at four or five, but appellee says there were not so many; at any rate it is certain that Mrs. Brown was one, and young Kennedy another, who went to the rear of the coach from which it is said that young Ken-

nedy, or some other young man shoved Mrs. Brown off.
Mrs. Brown herself did not testify, but all the other pas-
sengers, who did not rush to the rear of the coach, and
who testified at all, stated that they got down behind
the seats, and it is evident that thereafter they heard
more than they saw, and so far as the evidence of the
passengers is concerned the last any of them saw of the
conductor, he was following Mr. Kennedy down the aisle
of the car and calling out to Kennedy to "cut that out,"
and it appears he signalled the engineer to stop the train
and that an emergency stop was made. A Mr. Hoffman,
who testified for the appellee, gives about as graphic an
account of the difficulty as any other witness, and there
is no substantial conflict between his statement and that
of any other witness who testified in the case, and his
evidence was substantially as follows: "I was in the
car sitting near the back on the left-hand side. Mrs.
Brown was about four seats from the front of the car.
Mr. Kennedy was in the back near where I was. Mr.
Lynch was in the front of the car on the left-hand side,
the same side Mrs. Brown and I were on. I saw the
auditor that day but did not see him at the time. I did
not see the conductor until after the shooting commenced.
We left Brinkley just about on time going to Saulsburg,
the first station from Brinkley and took on Mr. Lynch.
He came in in the front of the car. Just as he was sit-
ting down, there was a gun fired just behind me. Mr.
Lynch jumped up in the car and tried to look up to see
who was shooting, and Mr. Kennedy was then advancing
from the end of the car and Mr. Lynch went out the front
end of the car. Mr. Lynch was not shooting at that time.
I do not know where the conductor was when the shoot-
ing commenced, but would judge he was in the car near
the back end. He walked up to the front end of the car
after Mr. Kennedy and told him to stop that, and when
Mr. Lynch came to the door with his gun in his hand he
reached for the air cord and held the cord; then he
jumped back of the seats. He did not make any effort
to take hold of Kennedy that I saw, nor did he ask any-

body else to. Kennedy was going toward the front end
of the car with his back toward the conductor. When
the shooting began Mrs. Brown started running down
the aisle toward the back end of the car. She put her
right hand on the car door facing and some one knocked
her over the back end of the car to the ground. At that
time the conductor was across the seats from me. I do
not know where the auditor was. It was one of two boys
that pushed Mrs. Brown off the car; either Mr. Ken-
nedy's boy or some other boy there. They were trying
to get out of the back end of the car. There was a panic.
Everybody was dodging bullets. The conductor was in
the car, about four seats from the back end. He made
no effort to take hold of Mr. Kennedy, or to stop the
shooting. There was nothing about Mr. Lynch's coming
into the car that was unusual and there was nothing to
indicate that anything was going to happen. I was sit-
ting possibly two seats in front of Mr. Kennedy, with
my back to him. When I looked back he was right at
my side. Mrs. Brown was six or eight seats ahead of
me. There were two or three other passengers between
us. I would judge there were about twenty or twenty-
five passengers in the car. Mr. Kennedy followed Mr.
Lynch up the aisle, as Mr. Lynch went out of the front
of the car. After the first shot Mr. Lynch immediately
started walking to the front of the car with Mr. Kennedy
following and shooting at him. Mr. Lynch was in the
front seat from the front end and went forward promptly,
but not as fast as I would have done. Mr. Kennedy was
going in a half trot. Mr. Lynch went out the front end
of the car when Mr. Kennedy was about half the length
of the car and Mr. Kennedy was five or six feet from the
front end of the car when Mr. Lynch appeared, coming
back. He ran across the door and fired his first shot
after he crossed over the front of the door; then he com-
menced shooting as he came in. Mr. Kennedy fell with
his feet between the first seats and the ladies' toilet.
The conductor followed Mr. Kennedy toward the front
end of the car, four or five seats, and hallooed to him a

time or two to stop; then, as Mr. Lynch appeared shoot-
ing back that way, he reached up and got the air cord,
and then got behind the seats. It appears Mrs. Brown
was seated between the combatants, when the shooting
began, and a witness testified that he noticed the seat in
front of where she sat and there was a bullet hole in the
back of the seat. About twelve or thirteen shots were
fired, and when the firing had ceased Mr. Kennedy was
lying in the front end of the car dead. Kennedy had
fired four or five shots, and Lynch had fired eight or
nine.''

The brakeman testified that he was in the smoking
car going toward the baggage car when he heard a shot
fired and that he turned around and saw Mr. Lynch com-
ing out of the rear coach with a gun in his hand, and
just about that time he heard another shot; that he was
in the range of the bullet and stopped in the third seat
of the smoking car and got out of the range, when he
came to the front door and stepped to the side where
he could see Mr. Lynch, who was bloody, and he stepped
out to catch him as he thought he was going to fall off,
when Kennedy fired again and broke the glass off the
vestibule, when the witness backed up against the wall
again. Mr. Lynch seemed to be working his gun against
his leg, and when he had gotten it in condition to fire
he ran into the car and commenced shooting. Mr. Ken-
nedy met him at the front of the car and was killed at
that place.

The conductor testified that the train had not got-
ten in full motion when the shooting commenced and
had only run about 150 or 200 yards, when it stopped, and
that when the shooting began he was on the opposite side
of the car from the bell cord, but that he pulled it as
soon as he could get to it, and that there was nothing
that he could have done to have prevented the shoot-
ing; that he was going to the rear of the car when the
shooting began and that he turned and followed Mr. Ken-
nedy about half way of the car, when he stopped, because
at that time Mr. Lynch came in the car shooting in his

direction. The conductor testified further that a number of passengers ran into him as he followed after Mr. Kennedy.

*Thos. S. Buzbee* and *Jno. T. Hicks,* for appellant.

The court should have directed a verdict for the defendant. The testimony clearly shows that the affray took place so suddenly and unexpectedly that the defendant could neither have foreseen the difficulty nor prevented injury to the plaintiff's wife.

A verdict against a carrier in an action of this nature can not be sustained, unless it appears that the employees of the carrier had, or should have had, knowledge of the impending trouble, or, after the trouble started, had opportunity to prevent the injury and failed to do so. 53 Miss. 200, 24 Am. Rep. 689; 32 L. R. A. 792; 47 *Id.* 120; 60 *Id.* 601.

*Stuckey & Stuckey* and *Manning, Emerson & Morris,* for appellee.

The law makes a carrier liable for injury resulting to a passenger from a negligent failure of its conductor to exercise the power vested in him over the movements of the train and over the passengers thereon, to compel the observance of the rules of the company by all persons on the train and to protect them from violence or wrongful injury by others. 97 Ark. 28. In the case relied on by appellant, 53 Miss. 200, the court said: "He (the conductor) is required to make a fair and honest effort to prevent the wrong. On the question of the care to be exercised by the company for the protection of passengers, see White on Personal Injuries on Railroads, § 758.

The degree of care is ordinarily a question of fact for the jury to determine under the circumstances of the particular case. 54 Fed. 116-121-124.

SMITH, J., (after stating the facts). Appellee says the evidence here discloses that appellant's employees were doubly negligent, first, in failing to exercise any

care whatever to stop the difficulty, and, second, in failing to endeavor to stop the panic among the passengers and thereby preventing Mrs. Brown being pushed from its moving train. A citation of cases is unnecessary because the law of the case is not in dispute, for if there is any liability here it would be upon the theory that the employees of the carrier had, or should have had, knowledge of the impending trouble; or that after the trouble started they had the opportunity to prevent the injury to any passenger and failed to do so. It is contended that the recovery can be sustained on the last ground only.

But we do not think a recovery can be sustained upon that ground. Appellee argues that the absence of the auditor is not accounted for, and seeks to draw an inference from that fact that he might have done something to have avoided this injury. But it is certain that he was not in the car where the shooting occurred, and while it is probably true, as appellee contends, that the auditor jumped off the train, there is still no proof that he could have prevented the difficulty, had he remained on it. There can be no recovery because of any breach of duty on the part of the brakeman. He was in a different coach when the shooting commenced, and was walking toward the baggage car, and away from the combatants, when his attention was attracted by the first shot that was fired. He saw Mr. Lynch on the front platform of the chair car and saw that he was wounded and bleeding, and the thought which occurred to him was to assist Mr. Lynch and prevent his falling from off the train. But before this service could be rendered, Kennedy had fired again and Lynch himself had gotten ready for action and had re-entered the chair car. If there was any breach of duty upon the part of any of the employees of the appellant company, it was upon the part of the conductor, and the conductor, auditor and brakeman are the only employees of the appellant company who are alleged to have had any duty to perform for the protection of the passengers in the train. Appel-

lee states his position as follows: ''It must have been apparent to the conductor that when the passengers were in a panic and running toward the rear end of a moving train, that some of them would either jump off in their excitement or be pushed off by others and injury result, and instead of conducting himself as one who had assumed the duties of a conductor of a railroad passenger train should have done, by endeavoring to have the passengers drop to the floor or behind the seats, he utters not one word of warning or advice and takes no steps whatever to quiet the excited passengers, or to stop the panic; but seems to have had but one thing on his mind and that was his own safety, as his action in dropping behind the seats clearly shows.''  And he further argues that ''an ordinary man would have attempted to stop Kennedy.  An ordinary man would have attempted to prevent the return of Lynch into the car.  Absolutely no effort was made to do any of these three things.  And, further, that the conductor should have grappled with Kennedy and called to his assistance the male passengers in the car, but this he did not do; but, like a hysterical woman, he halloos 'stop that' or 'cut it out,' pulls the bell cord and hides behind the seats.''  But it must be remembered that the conductor had no intimation that the difficulty would occur, and he was walking toward the rear end of the car when it occurred, and that if he had been unmindful of the safety of his passengers, as appellee says, he would have been the first to reach the rear of the car and safety, yet the proof was undisputed that he turned and walked toward Mr. Kennedy, who was advancing rapidly away from him, and that he called upon Kennedy to ''cut that out.''  It must also be remembered that this was no ordinary fisticuff, but that it was a duel to the death between two desperate men, and that it commenced without warning, and had ended while the train was running only a few hundred feet.  Had the conductor attempted to pacify the passengers, by compelling them to remain in their seats, or to hide behind them, some passengers might have been killed by a stray

bullet.  The conductor was called upon to act in a very unexpected emergency, and during a period of intense excitement.  Every person who testified stated that the conductor followed after Kennedy, and commanded him to cease firing; but Kennedy was in no mood to be thus easily restrained.  It is certain, too, that Mr. Lynch was not leaving the car to avoid the difficulty, but was only seeking an opportunity to bring his weapon into action, and, as soon as he had gotten his pistol so that it would shoot, he came back into the car and the duel to the death was fought, and Kennedy fell dead opposite the first seat.  The evidence shows that Kennedy walked rapidly toward the front of the car, and, while it might have been possible for the conductor to have overtaken him, it is only a conjecture that he could have done so, in view of the fact that passengers passed him in going to the rear of the train; at any rate, Mrs. Brown passed him in the aisle, if other passengers did not.  He might have grappled with Kennedy, and have called upon the male passengers to come out from behind their seats and assist in restoring order, and they might have been encouraged by his coolness so to do, but, had this been done, we can only conjecture that Kennedy might have been subdued, and that Lynch might have been induced not to renew the shooting, when he got his own pistol in condition to fire.  But we think this is a highly improbable view of this evidence.  When this evidence has been analyzed, we think a recovery can be had only upon the theory that a passenger was injured, and that by some possibility something might have been done which was not done, but the evidence does not show what that was.  We think the only reasonable view of this evidence is that there was nothing, which the members of this train crew could have done, which would have prevented this unfortunate occurrence, and as carriers are not absolute insurers of the safety of their passengers, the case must be reversed and the cause dismissed.