BEASLEY v. HINES.

## Opinion delivered March 15, 1920.

1.  CARRIERS—SHIPPER OF LIVE STOCK A PASSENGER WHEN.—A shipper of livestock riding by permission in the stock car was a passenger, and as such entitled to the degree of care due to a passenger, but not to the protection which he would have had on a pasger car or in the caboose.

2.  CARRIERS—DEGREE OF CARE DUE TO PASSENGER.—In measuring the care due to a passenger the circumstances of the particular case should be considered.

3.  CARRIERS—NEGLIGENCE IN PERMITTING ROBBER TO BOARD TRAIN.—In an action by a shipper of live stock, who had been permitted by the carrier to travel in a stock car, for injuries committed by a robber who had boarded the car, *held* under the evidence that there was no issue for the jury as to whether the carrier was negligent in permitting the robber to board the train, as the train crew was under no duty to patrol the car to prevent persons from entering the stock cars.

Appeal from Saline Circuit Court; *W. H. Evans,* Judge; affirmed.

*Emerson, Donham & Shepherd,* for appellant.

1. Appellant was a passenger. 105 Ark. 340; 113 *Id.* 265.

2. Under the law the railway company was bound to the same high degree of care to protect appellant from injury as if he had been on a passenger train, the duty (being modified only by the nature of the train and the necessary difference in the mode of operation. 87 Ark. 109; 83 *Id.* 22; 76 *Id.* 520.. Hence the evidence was sufficient to submit the case to a jury and the court erred in refusing to do so. Cases *supra;* Hutchinson on Carriers (3 Ed.), sec. 895, p. 995; 97 Ark. 24. A carrier must potect its passengers from violence and insults so far as it can be done by exercise of a high degree of care. 4 R. C. L., p. 1181, § 606; White on Pers. Injuries on Railroads, p. 1149, sec. 761; Thompson on Neg., § 3085, p. 544; 10 C. J. 906, § 1334; 35 Pac. 196; 24 S. E. 467. This case falls within the rule in 89 Ark. 581.

*E. B. Kinsworthy* and *B. S. Kinsworthy,* for appellee.

1. There was not sufficient evidence for this case to go to a jury. 111 Ark. 288-298; 32 L. R. A. 792.

2. It was impossible for the railroad company to have anticipated the injury alleged. 115 Ark. 262; 52 *Id.* 517; 75 *Id.* 211. A verdict was properly directed as reasonable care could in no way have prevented the accident. 75 *Id.* 211.

3. Appellant is barred by his contract; he assumed the risk. 82 Kan. 152; 107 Pac. 565; 75 N. E. 457.

SMITH, J. In support of his cause of action appellant testified as follows: He entered into a contract with the railroad company for the shipment of a carload of live stock and one of household furniture and farm implements, from Bowling Green, Missouri, to Donaldson, Arkansas. He left Bowling Green Friday night, and, with the knowledge and consent of the various train crews, rode in the car containing his stock. The train of which his cars were a part left Little Rock about 10 o'clock Monday night, and he fell asleep soon afterwards, and slept until he was awakened by some one pounding on the door of the car. The train had then stopped. He asked what was wanted, but received no reply. The man at the door, who later proved to be a robber, walked around to the other side of the train. The door on that side was open for about six or eight inches, and he lit a lantern and hung it on the beam across the car right in front of the door. He looked out and saw that it was still dark, but noticed several tracks and knew that they were in some switch yard. These tracks were made visible by an electric light, which may have been the headlight of another engine. He saw the man and asked him what he wanted, and the man replied that he was a brakeman and wanted to see if the stock in his car had room to lie down. During his journey the train men had frequently come into his car to see about the cattle. He asked where they were, and was told that they were in Benton. He

undid the door, and the man climbed into the car, and sat down on some boards he had nailed across the door, and commenced to talk about the horses. The man remained seated for a few minutes, when it began sleeting, and the man said, ''I think I will stay here for a while,'' and about that time the train started. After going some distance the train took a sidetrack to allow a passenger train to pass. In his own language the narrative is continued as follows: ''I thought it was queer of him being in there, and I told him that I didn't believe he was a brakeman because he had on too good clothes, and he said, 'I'll be honest with you, partner; I knew one of the brakeman on the train, and he told me what to do, and he told me the car was going to Donaldson, and I could ride that far.' I began to feel uneasy about his presence in the car, and I listened and watched for a brakeman to pass through to the side of the car or on top of it; but I am positive that none passed the side or over the top, because I had a light in the car and the door was open about two feet. Just as soon as the train pulled out of there, this man, who had been sitting with his face toward me, turned around with his back toward me for a few minutes and faced the door. Suddenly he turned around with a revolved in his right hand, a flashlight in his left hand, and demanded that I put my hands up. I said, 'You don't mean that; you are joking, partner,' and he said, 'God damn you, put them up, or I will blow your damn head off.' I grabbed the gun with my left hand and reached in my hip pocket with my right and threw my pocketbook, which contained about $180, in the straw at the horses' feet, but he jerked the gun out of my hand and jumped back out of my reach. I saw that he was going to shoot when he pulled the gun out of my hand and I turned my left shoulder toward him, and he shot me. He then told me to turn around and he felt in my hip pocket, but found nothing in there. He then searched my other pockets and obtained about $15 from them. He then came over and found the pocketbook that I had thrown in the straw, and took it also. He remained in

the car for about five or ten minutes after he shot me, and as we were going up a long hill he jumped off the train and escaped. * * * The car in which I was riding was the third car from the engine. There were two box cars between me and the engine. I continued to ride on the train until we got to Donaldson, where I was treated by a physician.''

No one requested appellant to ride in the caboose at any time, but he knew he had the right to do so if he wished.

No other testimony was offered, and the court directed the jury to find for the defendant, and this appeal comes from the judgment pronounced on the verdict thus returned.

This appeal is prosecuted upon the theory that appellant was a passenger, and that the railroad company, in the exercise of the care which should have been bestowed upon him as such, should have anticipated the probable presence of the robber in the car, and should have taken the necessary precautions to protect appellant from the injury inflicted upon him.

Appellant was a passenger, and the company did owe him the degree of care due a passenger, but, in measuring that care, we must take into account the circumstances of the case. It is obvious, of course, that the company could not afford appellant the protection which could and should be given on passenger trains; nor, for that matter, could it give appellant the protection he might have expected and would, no doubt, have had, had he traveled in the caboose, as he had the right to do. *St. L. & S. F. Rd. Co.* v. *Coy,* 113 Ark. 265.

Here the robber entered the car with appellant's consent. It is true the robber first said the purpose of his visit was to see if the stock had room to lie down, and later that the brakeman had given him permission to ride in the car. This testimony was competent to show that appellant was not guilty of contributory negligence in admitting the robber into the car; but it has no probative value to charge the company with liability for

the robber's conduct. Appellant's suspicions were aroused before his train took the sidetrack to allow the passenger train to pass; yet during the interval they waited on that account he did nothing to apprise the train crew of the man's presence or his suspicions concerning him. The robber made no assault until the train was in motion, and he left the train before it stopped. The shot was fired inside the car and at a time when the train was under full headway. The night was cold, and it is highly improbable that any member of the train crew could have heard this shot or could have told whence it came, had they heard. But it would have availed nothing had they heard it, as the passenger was then injured.

We think no issue for the jury was made as to the negligence of the company in permitting the robber to board the train. It is a matter of common knowledge that in the practical operation of trains it has been found impossible to prevent tramps from boarding them, and the train crew must be presumed to have had that knowledge. But that knowledge did not impose upon the train crew the continuous duty of so patrolling appellant's cars as to make it impossible for tramps to enter them without being discovered. We think what was said in the case of *C., R. I. & P. R. Co.* v. *Brown,* 111 Ark. 288, is applicable here: ''When this evidence has been analyzed, we think a recovery can be had only upon the theory that a passenger was injured, and that by some possibility something might have been done which was not done, but the evidence does not show what that was. We think the only reasonable view of this evidence is that there was nothing, which the members of this train crew could have done, which would have prevented this unfortunate occurrence, and as carriers are not absolute insurers of the safety of their passengers, the case must be reversed and the cause dismissed.''

The judgment of the court below must, therefore, be affirmed.