79 P.2d 922

**MANNING v. ATCHISON, T. & S. F. RY. CO.**

**No. 4330.**

Supreme Court of New Mexico.

May 23, 1938.

W. C. Reid and E. C. Iden, both of Albuquerque, for appellant.

George S. Klock, of Albuquerque, for appellee.

HUDSPETH, Chief Justice.

The plaintiff recovered damages from the defendant in the sum of $350.00 for wrongful ejection from the latter's train at Belen, New Mexico, upon which she was traveling as a paid passenger from Albuquerque, New Mexico, to El Paso, Texas.

A man complained to the Albuquerque police that two negro women had stolen $50.00 from his pocket. It was later learned that two negro women had boarded a train at Albuquerque with tickets for El Paso, Texas. A Jane Doe warrant was issued and the night captain of police communicated with the agent or special officer of the defendant at Belen, New Mexico. He gave a description of the women and requested that the pickpockets, if found on the train, be detained. Instead of the pickpockets the plaintiff, a resident of Albuquerque for fourteen years, and lately graduated from the high school, and her sister, respectable colored women of good reputation, in no way connected with the alleged offense, were taken off the train at Belen. The testimony is in sharp conflict. Appellee claims that the conductor ejected her and her sister from the train without giving them any reason for so doing or telling them that they were charged with a crime. The conductor, on the other hand, testified as follows:

"A. When I took up the tickets from all the passengers as I came along I came to these two women that were passengers on the train in the chair car and I asked for their tickets and they gave me their tickets; * * * When we got to Belen the train stopped there and I was on the platform of the car, the front end where we discharge passengers, and my porter was at the bottom of the step when the passengers that were getting off at Belen came out onto the platform. I started to step off behind them and the special officer

stepped in front of me and he had a paper in his hand and he said: 'I have a message from the Albuquerque Police Department.' * * * He was an officer of the railroad company and I knew him because he had his cap on that said 'Station Agent,' or 'Station Master,' but of course he had to show me some authority for going in there and removing a passenger. When he said, 'I have a message from the Albuquerque Police Department to take two colored women off your train with tickets for El Paso, and have you those women on your train'? then I said to him, 'I have two colored passengers, women, on the train and they have tickets from Albuquerque to El Paso and return, and I will point out my passengers to you if you will come inside with me.' Which he did. And I said to the two girls, women passengers, 'This officer wants to see your tickets,' and after I said that I walked out of the car. I didn't speak one word to these women outside of that, nor to any other person. I didn't say anything to the officer only just that because I had other duties to perform there, and I walked out of the car to attend to those other duties."

If the conductor had known that the special officer was a deputy sheriff, and was acting as such, his conduct, if as delineated, would have been exemplary. Brunswick & W. R. Co. v. Ponder, 117 Ga. 63, 43 S.E. 430, 60 L.R.A. 713, 97 Am.St.Rep. 152; Owens v. Wilmington, Etc., R. R. Co., 126 N.C. 139, 35 S.E. 259, 78 Am.St.Rep. 642; Beasley v. Hines, 143 Ark. 54, 219 S.W. 757, 15 A.L.R. 864 and anno. 885; Louisville & N. R. Co. v. Byrley, 152 Ky. 35, 153 S.W. 36, Ann.Cas. 1915B, 240 and note; Chesapeake & O. R. Co. v. Pack, 192 Ky. 74, 232 S.W. 36; note 15 A.L.R. 886; Thompkins v. Missouri, K. & T. Ry. Co., 8 Cir., 211 F. 391, 52 L.R.A.,N.S., 791; Clark v. Norfolk & W. R. Co., 84 W.Va. 526, 100 S.E. 480, 7 A.L.R. 117; Gassenheimer v. W. Ry. of Ala., 175 Ala. 319, 57 So. 718, 40 L.R.A., N.S., 998 and notes; Mayfield v. St. Louis, I. M. & S. R. Co., 97 Ark. 24, 133 S.W. 168, 32 L.R.A.,N.S., 525; 10 Am.Jur. 272; 4 R.C.L. 1181. At page 1193 of 4 R.C.L., § 617, it is stated:

"Where an arrest is sought to be made on a train by persons known to the crew to be officers of the law, and there is nothing to put them on notice that it is irregular, the carrier is not liable for failure of the trainmen to interfere and prevent it, or because of unnecessary violence to which the officers subject the passenger in making it, where the carrier's servants do not assist in such arrest. The duty imposed does not obligate either the carrier or its servants to offer active resistance to the officer of the law, or to inquire into the authority under which he assumes to act."

Whether a railway company is responsible for the trespass of its special officer, wearing the garb of a railway employee, who removes an innocent passenger from a train without disclosing the purpose, and later, in the capacity of deputy sheriff, arrests the passenger, we are not called

upon to decide, since the court found that the conductor was alone responsible for the removal of plaintiff.

The findings are that, without making inquiry or investigation as to the identity of the parties, the conductor requested the plaintiff and her sister to leave the train at Belen; that they asked why they were being put off, but were not informed, and that they were removed from the train against their respective wills. The court also found:

"That when said plaintiff and her sister left said defendant's train pursuant to the request of defendant's conductor, the said conductor placed the said plaintiff and her sister in the custody of H. L. Rickard who was an agent and employee of said defendant.

"That said defendant by its agent wrongfully and unlawfully ejected and imprisoned said plaintiff and her sister when no criminal charge whatever had been made against the said plaintiff and her sister.

"That the failure of the defendant's conductor of the defendant's train and the special officer of the defendant who had the plaintiff and her sister in charge after their said removal from defendant's train to interrogate the plaintiff and her sister as to who they were, their names and their places of residence, was an act of gross injustice on the part of the defendant's conductor and on the part of defendant's officer, H. L. Rickard, and exhibits gross negligence on the part of the said defend-

ant's conductor and said defendant's officer and agent.

"That the descriptions which were given by officer, Russell C. Charlton, to the defendant's ticket agent at Belen, New Mexico, was not observed by the defendant's ticket agent at Belen, New Mexico, as the plaintiff and her sister who were unlawfully restrained at Belen, New Mexico, did not fulfill the descriptions that officer, Russell C. Charlton, communicated to the defendant's agent at Belen, New Mexico, and that there was not even a faint resemblance to the plaintiff and her said sister."

The Jane Doe warrant (the validity of which may well be questioned, 6 C.J.S., Arrest, p. 578 § 4; 5 C.J., p. 394; 4 Am. Jur., p. 9) was issued in another county and was not in the hands of the deputy sheriff at Belen. His only authority was a message from the police department of Albuquerque containing the description of the two negro women pickpockets for whom the warrant was issued. Appellant cites 2 R.C.L., p. 450, par. 6, which states:

"Probable Cause for Arrest of Suspected Person. In cases in which an arrest without a warrant may be made by a police officer or private individual, of a person suspected of having committed a felony, the person making the arrest may act either upon facts within his own knowledge or on those communicated to him by a responsible person. He has no authority, however, to arrest on the mere belief that a person has been guilty of an offense,

if such belief has no foundation in fact or sufficient circumstances on which to rest, or if he unreasonably acts at the request of a third person who himself has a mere suspicion of the guilt of the one who is arrested. To afford a justification there must be not only a real belief and reasonable grounds for it, but where there is an opportunity to make inquiry proper investigation as to the facts should be made, and an officer is not warranted in relying upon circumstances deemed by him suspicious, when the means are at hand of either verifying or dissipating those suspicions without risk, and he neglects to avail himself of those means. * * *"

The court found that there was no investigation made and there evidently was no care or discrimination exercised, since the Albuquerque police officer reported to his superior as follows:

"I called ticket agent at Belen and read him the description of the women and told him if the women on the train answered the description closely to take them off. * * These women do not answer the description that I gave the ticket agent. * * * There is not even a faint resemblance between the two women they held and the description I gave them. * * *"

█ It is the duty of an officer before making an arrest without a warrant not only to make a careful investigation as to the identity of the accused, but to give the party notice. 6 C.J.S., Arrest, p. 602, § 6, states the rule as follows:

"It is, ordinarily, incumbent on an officer, seeking to make an arrest, without a warrant, to inform the accused of his authority or official character, of his intention to arrest him, and of the offense for which he is being arrested. . * * The reasons for so doing are as great, if not greater, than where there is a warrant." * * * An officer must make a reasonable disclosure, adapted to the circumstances, of his character and purpose; but, as a general rule, the notice is sufficient when it is such as to inform a reasonable man of the authority and purpose of the one making the arrest, and the reason thereof. Circumstances, without express words, may afford sufficient notice."

See, also, 4 Am.Jur., p. 32, § 48. If the plaintiff had been given notice it is probable that the blunder would have been avoided. The porter of the train was an old acquaintance of plaintiff, and there were other colored friends on the train. She was only thirty miles from her home where her father was well known and was employed by one of the banks as janitor. He had a telephone in his residence and if the railroad employees had given any consideration whatever to the plaintiff they would have promptly discovered that plaintiff and her sister were not the women wanted. The only similarity pointed out by the witnesses for the railway company between the plaintiff and her sister, on the one hand, and the description of the pickpockets given by the police officer in his message, was that they were negroes.

■ It is obvious from the facts found by the court quoted above, which are supported by substantial evidence, that the conductor took in hand the matter of the removal from his train of the plaintiff and her sister upon receiving the communication from the special officer, and without inquiry as to identity or description of the parties wanted by Albuquerque officers, other than that they were negro women bound for El Paso, proceeded to eject the plaintiff and her sister. Appellant cites Anania v. Norfolk & W. Ry. Co., 77 W. Va. 105, 87 S.E. 167, L.R.A.1916C, 439; Burton v. N. Y. Cent. & H. R. R. Co., 147 App.Div. 557, 132 N.Y.S. 628, affirmed 210 N.Y. 567, 104 N.E. 1127, and other cases where the law officers forced passengers to alight from trains after they had been arrested. Here the conductor put the passengers off his train before the officer uttered a word to the passengers. This was positive misconduct toward the passengers. His only thought seems to have been to quickly rid his train of the women. That plaintiff's ejectment was wrongful and that the conductor trespassed upon her rights and breached the railway's contract safely to transport the plaintiff and to protect her against the misconduct of the company's employees clearly appears. The defendant is liable for the acts of its conductor under the circumstances of this case.

■ "A carrier is ordinarily liable for any acts of its employees committed within the scope of their general authority and resulting in the wrongful expulsion of a passenger. Thus, the conductor of a railroad train or street car in ejecting a passenger therefrom is acting within the scope of his general authority, and the carrier is liable for the manner in which he performs this duty. * * * § 1537. What constitutes Ejection. A passenger, whether right or wrong in a dispute with a conductor, is under no duty, either legal or moral, to remain on the train until the conductor resorts to force for the execution of his commands. He is regarded as having been ejected if he obeys a command to leave the train or vehicle of the carrier. If this is wrongful, a cause of action arises. * * *" 10 Am.Jur., p. 311, 312.

See, also, Gillingham v. Ohio River R. R. Co., 35 W. Va. 588, 14 S.E. 243, 14 L.R.A. 798, 29 Am.S.R. 827; Texas Midland R. Co. v. Dean, 98 Tex. 517, 85 S.W. 1135, 70 L.R.A. 943; Moore v. Louisiana & Arkansas Ry. Co., 99 Ark. 233, 137 S.W. 826, 34 L.R.A.,N.S., 299; St. Louis, Iron Mountain & So. Ry. Co. v. Tukey, 119 Ark. 28, 175 S. W. 403, L.R.A.1915E, 320; Norfolk & W. R. Co. v. Galliher, 89 Va. 639, 16 S.E. 935; Elliott v. Philadelphia & Camden Ferry Co., 83 N.J.L. 625, 83 A. 899; George v. Norfolk & W. R. Co. et al., 78 W. Va. 345, 88 S.E. 1036; Atchison, T. & S. F. Ry. Co. v. Henry, 55 Kan. 715, 41 P. 952, 29 L.R.A. 465.

Other questions are argued, but in our view of the case it will not be necessary to consider them.

Finding no reversible error in the record, the judgment of the district court will be affirmed, and it is so ordered.

ZINN, Justice.

I concur.

BRICE, Justice (concurring).

I concur in the opinion of Mr. Chief Justice HUDSPETH:

The one thing that stands out in bold relief in this case is the fact that plaintiff, a woman passenger on defendant's train, who had a ticket which gave her the right to remain thereon, was wrongfully ejected from the train; by reason of which she was damaged in the amount of three hundred dollars.

If she was removed from the train by defendant then it was liable for the damage done; if by officers, the responsibility lies there, whether actionable or not.

The question is whether the facts justify the judgment.

"* * * Upon the trial of any .question of fact by the court, its decision must be given in writing and filed with the clerk in the cause, and in such decision the court shall find the facts and give its conclusions of law pertinent to the case, which must be stated, separately * * *." Section 105-813, Comp.St.1929.

The findings of fact made as required by this statute, are the facts upon which a case is determined in this court, unless one or more of such findings are set aside by us upon direct attack. State ex rel. Walker v. Hinkle, Com'r, 37 N.M. 444, 24 P.2d 286; Arias v. Springer et al., 42 N.M. 350, 78 P.2d 153; Supreme Court Rule 15, § 6.

The purpose and intent of the statute is that the district court shall prepare a decision consisting of findings of fact and conclusions of law stated separately, with each finding of fact and each conclusion of law separately paragraphed; and when so prepared, that it be filed in the case as a part of the record proper, and thereupon becomes the decision upon which the judgment thereafter to be entered, must find its support. The findings required are of those ultimate facts (if authorized by the evidence) which plaintiff must prove to establish his right to a judgment, and in the absence of any of which his case fails; and of those ultimate facts (if authorized by the evidence) which the defendant must prove to establish his defense, and in the absence of any of which his defense fails. Merrick v. Deering, 30 N.M. 431, 236 P. 735.

It required no more than a page or two of typewriting to cover every ultimate fact and. conclusion of law required by the statute to be made, to authorize the judgment entered in this case. Instead of following the purpose and intent of the statute, the district court adopted as findings of fact eighteen pages of typewriting, a mass of evidentiary facts, conclusions of fact and law, and statements on various subjects not necessary to a decision; with a few

kernels of ultimate facts scattered through, which we must separate from the mass of chaff to arrive at the ultimate facts upon which the judgment is based. The statute requires the court, not counsel, to make the decision.

The division of the court is over the facts regarding the ejection of the women from defendant's train, and of their legal effect. These facts, as found by the court, are as follows:

The plaintiff and her sister purchased tickets from the defendant's agent at Albuquerque, entitling them to transportation on defendant's train from that station to El Paso, Texas, and return. They entered defendant's train in Albuquerque and started on their journey to El Paso. The conductor received their tickets for such transportation. At the station of Belen, en route to El Paso, the defendant's conductor requested the plaintiff and her sister to leave the train and ordered their suitcases removed therefrom, without informing them why they were required to leave the train, though they inquired of him the reason therefor. Acting upon the request of the conductor, and against their will, they left the train with him and he placed them in the custody of H. L. Rickard, an employee of the defendant but who at the time was acting as a peace officer and not as an agent of the defendant.

The findings of the court are attacked, but the foregoing is substantially supported by the testimony of plaintiff and her sister. We are not permitted to set aside findings made by the trial court if substantially supported, though against the apparent weight of the testimony.

The plaintiff testified:

"The conductor took our tickets, which were round-trip tickets, punched them and returned them to us. At Belen the conductor came along and commenced to take the tickets off the window and my sister asked 'What is wrong? Do we change here?' And he told us, 'No,' that we were to get off there. My sister asked again if anything was wrong, and he refused to tell us. With him was another man that I suppose was a special agent. The conductor called the porter to come and get our bags and he got our bags and they put us off the train and the train left and the special agent took our bags and we started towards the station. They did not explain anything to us. Only the conductor spoke to us on the train."

The plaintiff's sister testified:

"When we got to Belen the conductor told us we had to get off. I asked if we got off there, or did we have to change. They did not give us an answer. The minute we got off the train left. We went into the station and the officer stood guard over us."

This testimony shows that defendant's special agent (who was a deputy sheriff) was present, but did not speak to the women; that the conductor alone put them off the train. This testimony also substantially supports the findings to the effect

that the conductor alone ejected these women from the train, and that the peace officer took no part in it. The testimony is conflicting, but the court believed the women's story, and not that of the train officials, or its agent, the deputy sheriff. We are bound by the court's findings.

It is suggested that defendant's conductor "merely cooperated with officer Rickard in ejecting plaintiff from the train." This is based upon an opinion filed in the case by the district court, prior to the making of his findings of fact and conclusions of law in the case. The statement is in substance that the court would find that the special officer Rickard "assisted" in ejecting the plaintiff from the train; and again, that the defendant's conductor "assisted" in ejecting plaintiff from the train. No part of the opinion of the district court is "findings of fact," as contemplated by section 105-813, N.M.Comp.St. supra.

It was stated in Brothers v. United States, 250 U.S. 88, 39 S.Ct. 426, 428, 63 L. Ed. 859:

"Upon the argument here, appellant quoted somewhat amply from the evidence taken before the Court of Claims. For the purposes of our review the findings of that court are to be treated like the verdict of a jury, and we are not at liberty to refer to the evidence any more than to the opinion, for the purpose of eking out, controlling, or modifying their scope."

The statute provides for the making of findings of fact and conclusions of law as a decision of the court in a single docu-ment, and filing it as a part of the record proper. Martin et al. v. Hot Springs, 33 N.M. 396, 268 P. 568. The district court is not required to write or file an opinion, and if filed it is no part of the record proper. We are not permitted to eke out findings by resort to the opinion of the district court. Brothers v. United States, supra; Riebel v. Mueller et ux., 177 Minn. 602, 225 N.W. 924, 66 A.L.R. 1.

It is suggested that the following fragmentary statements found among the allegations in plaintiff's complaint, should supplement the findings of fact; that it will establish that the officers of the law, and not defendant's conductor, ejected the plaintiff from the train. These fragmentary statements are as follows:

"* * * and said defendant's Conductor proceeded with plaintiff and her sister to the walk immediately outside the train at Belen; New Mexico, and placed the plaintiff and her sister in the custody of H. L. Rickard, who was also an agent and employee of the defendant and who was on the train when the Conductor ordered the plaintiff and her sister to leave the defendant's train; that the said H. L. Rickard also cooperated with the defendant's Conductor at the time the plaintiff and her sister were ordered by the said defendant's Conductor to depart from said defendant's passenger train; * * *."

"* * * said defendant's agent, H. L. Rickard, and said defendant's ticket agent at Belen cooperated in all things with said defendant's conductor in the removal of

plaintiff from said defendant's passenger train. * * * "

"That after the removal of the plaintiff from said defendant's railway train by said defendant's conductor and in which removal the said defendant's agent and employee, H. L. Rickard, and said defendant's ticket agent at Belen cooperated with said defendant's railway conductor, the plaintiff was held in the custody of H. L. Rickard. * * * "

" * * * said H. L. Rickard, and the ticket agent of defendant at its station in Belen, New Mexico, caused the plaintiff to be removed from said train. * * * "

If in fact the findings of the court are to be supplemented by statements in plaintiff's complaint regarding her ejectment from the train, the plaintiff is entitled to have all the allegations on the same subject added to the findings.

The segregation of that portion of the allegations on this subject in the complaint that aids defendant's case, is totally unfair.

I find in paragraph 7 of the complaint, a part of which has been quoted, the following:

" * * * the Conductor of said defendant's passenger train, being the authorized agent of the defendant and in charge of said train, ordered the plaintiff and her sister to leave the train, and the defendant's Conductor made the plaintiff and her sister leave the train at Belen, New Mexico; that the defendant's Conductor and agent did not inform the plain-

tiff and her sister why he ordered them to depart from the defendant's train, although plaintiff and her sister both asked the defendant's said conductor why they were put off the defendant's train at Belen, New Mexico; * * * and said defendant's Conductor proceeded with plaintiff and her sister to the walk immediately outside the train at Belen, New Mexico, and placed the plaintiff and her sister in the custody of H. L. Rickard, who was also an agent and employee of the defendant and who was on the train when the Conductor ordered the plaintiff and her sister to leave the defendant's train; * * * ."

The specific assistance rendered by Rickard is not alleged.

Nor is there any statement in the testimony of plaintiff and her sister (upon which the district judge based his findings) that indicates Rickard took part in ejecting them from the train, but to the contrary both women testified that it was the act of the conductor alone. The allegation regarding Rickard "assisting" the conductor may have had reference to Rickard's receiving the plaintiff and her sister at the door of the car and placing them under arrest.

It is not contemplated by the statute that the decision of the court should be augmented by the allegations in the pleadings. It has been held that allegations of ultimate facts in a pleading, which by answer or reply, the opposite party admits, or does not deny, has the force and effect of facts found. Mygatt et al. v. Coe, 124 N.Y. 212,

25 N.E. 611, 11 L.R.A. 646. We need not here determine whether this holding is consistent with our statute, which requires that findings of fact and conclusions of law be made as the decision of the court, and filed as a part of the record proper; as the defendant here specifically denied all of the allegations which we have quoted.

It cannot have been intended that the defendant should have the benefit of the allegations of fact in the plaintiff's complaint, which in his answer he asserts are false.

The district court may take notice of admissions of the parties, either in the pleadings, or by counsel in the progress of the trial of the case, in making his decision, and may incorporate such admissions in the findings; but this is because they are admitted facts.

But giving the defendant the benefit of the facts alleged, yet construing the findings thus enlarged in support of the judgment, as we must, (Guaranty Banking Corp. v. Western Ice & Bottling Works, 28 N.M. 19, 205 P. 728; Board of Trustees of Town of Torrean Land Grant v. Garcia, 32 N.M. 124, 252 P. 478) I conclude that the effect of the finding is that defendant's conductor was the one who removed the plaintiff and her sister from the train.

It is suggested that the real cause of plaintiff's removal from the train was the acts of officers of the law; that if the conductor had not removed them the officers would have done so; that it was less embarrassing to them for the conductor to do the wrongful act. The vice in this argument is the assumption that any one had the right to remove them from the train and thereby damage them. The act of removing them was a tort, and the one removing them was liable unless immune under the law. The officers of the law may have had protection in the warrant, but the defendant did not. Let me illustrate this thought: An innocent person has been convicted of murder and is on the scaffold to be hanged. The sheriff is possessed of a warrant authorizing him to take the defendant's life; but a good-intentioned neighbor, to prevent his suffering death by hanging, shoots and kills him. He would have been hanged anyway, but the neighbor is a murderer and liable to punishment as such, while the sheriff would have taken no risk in killing him. Another illustration: An officer has a warrant for the arrest of an innocent person, but an officious citizen desiring to save that person from embarrassment, forcibly takes him into custody in the presence of the officer, but without authority. He is liable for the arrest. The man would have been arrested in any event, but could have resisted under the circumstances stated, even to the extent of taking life, if necessary to protect his liberty.

The difference is, that the officer was possessed of authority to do the wrongful act and the conductor was not.

The authority of a conductor, regarding the arrest of passengers on trains, is not in

dispute. He is not required to investigate the nature of the charge against the passenger, nor whether the charge is legal, nor if the warrant is fair on its face, nor whether the officer (if known to be one) is in fact in possession of a warrant. If the person seeking to arrest a passenger is an officer of the law, and is acting in good faith, the conductor may point out those whom he believes to be the persons sought; and in case of resistance may advise them that it is best to submit to arrest; all of which may be done by any citizen. He need not protest against his passengers being arrested if he believes the officers are acting in good faith, or even if he had no belief at all upon the subject. He could stand passively and not interfere and his company would not be liable. Of course this does not apply if he actually knows that the arrest is unlawful; he then should protect his passenger.

The line of demarcation is plain and clear and no official of the railway need make a mistake. That line is crossed when the conductor usurps the authority of the officer of the law, and arrests or removes, or causes the removal, of the passenger from the train. He is not vested with authority (unless deputized or called to the assistance of the officer making the arrest, and that does not appear in this case) to order the passenger to leave the train or cause him to do so. As between the passenger and the defendant company, the former cannot be removed by the company, though charged with crime, and liability attaches immediately if he is removed by its agent. The arrest and removal is the duty of the officer of the law, not the conductor.

It is not a question of whether the warrant issued was for these particular passengers; the question is whether the conductor removed, or caused their removal from the train.

It must be remembered that Rickard did not speak to the women, or take any part in their removal (if he was in fact on the train, according to the findings); that they were not told the purpose for which they were ordered to leave the train; that no one took part in the incident of their leaving the train except the conductor, according to the findings of the court. Then why can it be said that the defendant is not liable for the tort?

It is suggested that unless we emasculate the law, overturn rules long established, and supplement the findings of the court with unauthorized facts and inferences, instead of upholding the judgment, as long established rules of procedure require, railway companies will not assist in the apprehension of criminals who may be passengers on their trains. This would be assuming a lack of good citizenship that I know does not exist. But if in fact such result should follow, nevertheless railway companies are not to be held immune from the penalties of the law following their unlawful acts, because of such threat or suggestion.

Burton v. N. Y. Central R. Co., 147 App. Div. 557, 132 N.Y.S. 628, is not in point.

There the conductor took no part in putting the passengers off the train. The extent to which he went was pointing them out and telling them that they had better go along with the officers without any trouble. This was mere advice, and no doubt good advice. If these women had been arrested by Rickard and had given trouble, such advice by the conductor would have been for the passengers' benefit, and would not in any manner have been taking part in the wrong done them. But no statement of similar import was made here. The conductor, without explanation, told the women to leave the train, ordered their baggage removed and the peace officer took no part in it. The Burton Case was not at all similar. The officers in that ·case were brutal and mean as the court found, and the conductor seeing this, advised them, "you had better go along without any trouble." There is a vast difference between giving good advice and putting people off the train.

The plaintiff had paid her railway fare and was rightfully on the defendant's train. Her ticket was evidence of the right to transportation from Albuquerque to El Paso, Texas, by virtue of a contract with defendant. Dickinson v. Bryant, 69 Okl. 297, 172 P. 432, L.R.A.1918E, 978; New York, L. E. & W. R. Co. v. Winter's Adm'r, 143 U.S. 60, 12 S.Ct. 356, 36 L.Ed. 71. It was not necessary to create a liability against the defendant, that the conductor resort to force in ejecting the plaintiff. She is regarded as having been ejected when she obeyed the conductor's command to leave the train. Georgia Railroad & Banking Co. v. Eskew, 86 Ga. 641, 12 S.E. 1061, 22 Am.St.Rep. 490; Reasor v. Paducah & I. Ferry Co., 152 Ky. 220, 153 S.W. 222, 43 L.R.A.,N.S., 820 and annotations.

I concur in affirming the judgment of the district court.

SADLER, Justice (dissenting).

If the defendant was the real cause of plaintiff's removal from its train, it should be held liable. If it was not, if in truth the real cause of her removal was a mistake on the part of officers of the law, then the defendant should not be made to pay for that mistake. The record satisfies me that her removal from the train was due to the acts of officers of the law involving a case of mistaken identity.

If there is one thing standing out in bold relief in the record before us it is the fact that the two women passengers removed from the train, the plaintiff and her sister, were the two very persons whose apprehension was sought under the Jane Doe and Jane Roe warrants as the *supposed* pickpockets. The fact that ·they were innocent; that the suspicions of the complaining witness and of the Albuquerque police officers were unfounded, was soon made manifest. These later developments, however, in no way weaken the obvious fact that prior thereto and because of a real or supposed similarity in description between the suspects and the real cul-

prits, the arrest of the plaintiff and her sister as the guilty parties was actually sought and accomplished.

It is undisputed that it was the departure of plaintiff and her sister on the 11:30 P. M. El Paso train with tickets for El Paso and a then supposed similarity in general description as to ages, dress and race that prompted the *hurried* filing of a criminal complaint at Albuquerque before Justice of the Peace Gober near midnight (he being gotten out of bed to attend the matter), the issuance of Jane Doe warrants and the long distance call by the Albuquerque police to a peace officer at Belen.

The plaintiff herself introduced in evidence from the files of the Albuquerque Police Department the penciled description of Acting Night Chief Charlton, made at the time and telephoned to the officer at Belen, reading:

"No. 1, short and heavy set, 18 years old, stocky build, brown dress, no hat. No. 2, tall and slender, age 25."

In addition, they were described as young colored women with tickets for El Paso. The only two other colored passengers shown in the evidence to have been on the train were a colored man and his wife traveling to an unannounced destination. The plaintiff and her sister were the only two young colored women shown to be on the train with tickets for El Paso. They were traveling together and occupied the same seat. But all doubt upon the question whether the two persons arrested were the two whose apprehension mistak-

enly was sought under the Jane Doe warrants is removed by plaintiff's recital of Officer Charlton's statement to her upon his arrival at Belen. The plaintiff testified:

"He (officer Charlton) said two girls were wanted in Albuquerque for picking a man's pocket and they were supposed to have taken the El Paso train *and they presumed we were the ones, and they had phoned to have us taken off the train at Belen.*" (Italics supplied.)

That Officer Charlton was not misquoted by the plaintiff appears from his own statement when cross-examined regarding his penciled descriptions made prior to the arrests and offered in evidence by plaintiff from the files of the Albuquerque Police Department as stated above. He testified:

"Q. What does that read there that you have just identified as your handwriting? A. No. 1, Short and heavy set, 18 years old, stocky build, brown dress, no hat. No. 2, Tall and slender, age 25.

"Q. Was that intended to be a description of those two ladies here, the plaintiff in this suit, and her sister, who were on the train and taken off the train at Belen? A. Yes, I presume it was. It was a long time ago and I don't recall, but I made that notation up there."

I am unable to agree with the statement in the prevailing opinion that the only similarity pointed out by the witnesses for the railway company "between the plaintiff and her sister, on the one hand, and the description of the pickpockets given by the

police officer in his message, was that they were negroes." At the least they answered the description as to race, as stated in the prevailing opinion; there was no wide disparity in ages (the plaintiff being not yet 19 years of age, a recent graduate of high school, and the sister married and evidently somewhat older); and they were traveling together upon tickets to El Paso.

Another mistaken view of the facts appearing in the prevailing opinion relates to whether the conductor recognized the special agent as a peace officer, acting as such. The opinion says: "If the conductor had known that the special officer was a deputy sheriff, and was acting as such, his conduct, if as delineated, would have been exemplary." In using the expression, "deputy sheriff," it was not intended, of course, to assert that only this type of peace officer may supersede the conductor in authority over a passenger in making an arrest. If the conductor recognized him as an "officer of the law" seeking to make an arrest, whether a sheriff, his deputy, a police officer, a constable or a G-man, he is excused in offering no resistance and not to be condemned for participation no greater in degree than that here shown.

As a matter of fact, Officer Rickard was a deputy sheriff at the time. The plaintiff made formal admission of that fact in the record. The court so found. It thus is made clear that Officer Rickard was a deputy sheriff. It is equally apparent that he was recognized and regarded by the conductor at the time as an officer of the law. In addition, although the prevailing opinion does not rest upon a contrary view, the record is convincing that he was with the conductor inside the coach when, as found, the conductor asked plaintiff and her sister to leave the train.

Special agent Rickard was what is known as a special officer of the defendant company, and had a deputy sheriff's commission. He is referred to by the conductor in his testimony quoted in the prevailing opinion both as an "officer" and a "special officer." That his status as a mere employee of defendant company was insufficient to satisfy the conductor of his right to enter the train and remove a passenger is disclosed by the following from the conductor's testimony, to-wit:

"He was an officer of the railroad company and I knew him because he had his cap on that said 'Station Agent,' or 'Station Master,' but of course he had to show me some authority for going in there and removing a passenger. When he said, 'I have a message here from the Albuquerque Police Department to take two colored women off your train with tickets for El Paso, and have you those women on your train?' then I said to him, 'I have two colored passengers, women, on the train and they have tickets from Albuquerque to El Paso and return, and I will point out my passengers to you if you will come inside with me.' Which he did."

If these facts alone can leave doubt on the question of recognition by the conductor of the special agent as an officer of the law, it is removed by the conductor's positive testimony: "I regarded him as an officer, police officer."

Incidentally, it may be said that the proof on the subject must have been deemed convincing, for plaintiff's counsel neither at the trial nor in this court has relied in support of the judgment upon any want of recognition by the conductor of special agent Rickard as an officer of the law, holding a deputy's commission.

Neither has there been any contention below or here that Deputy Sheriff Rickard was not aboard the train and at the least participating in the removal of plaintiff and her sister from the train. The plaintiff actually pleads this fact. In paragraph 7 of her complaint she alleges:

"* * * and said defendant's Conductor proceeded with plaintiff and her sister to the walk immediately outside the train at Belen, New Mexico, and placed the plaintiff and her sister in the custody of H. L. Richards, (Rickard) who was also an agent and employee of the defendant *and who was on the train when the Conductor ordered the plaintiff and her sister to leave the defendant's train; that the said H. L. Richards also cooperated with the defendant's Conductor at the time the plaintiff and her sister were ordered by the said defendant's Conductor to depart from said defendant's passenger train;* * * *" (Italics supplied.)

In paragraph 8 of her complaint the plaintiff alleged:

"* * * *said defendant's agent, H. L. Richards, and said defendant's ticket agent at Belen cooperated in all things with said defendant's conductor in the removal of plaintiff from said defendant's passenger train; * * * *"* (Italics supplied.)

In paragraph 10 of her complaint the plaintiff alleged:

"That after the removal of the plaintiff from said defendant's railway train by said defendant's conductor and *in which removal the said defendant's agent and employee, H. L. Richards,* and said defendant's ticket agent at Belen *cooperated with said defendant's railway conductor,* the plaintiff was held in the custody of H. L. Richards, * * * *"* (Italics supplied.)

In paragraph 12 of the complaint she alleged:

"* * * *said H. L. Richards,* and the ticket agent of defendant at its station in Belen, New Mexico, *caused the plaintiff to be removed from said train* * * *"* (Italics supplied.)

That the trial court took plaintiff at her word, so often emphasized and reiterated in her pleading, as aforesaid, upon the question of Conductor Quinlan's part as merely co-operating with Officer Rickard in her removal from the train is rendered obvious both by comment and specific findings embraced in the trial court's opinion. The court stated and found:

"It is clear from the evidence that neither special agent and deputy-sheriff Rickard or operator and ticket agent Mather were acting other than in their individual capacities in assisting a peace officer of a sister city. They were not acting at the time of receiving the information from Albuquerque and in their activities in moving towards securing the arrest of plaintiff, in the capacity of agents for defendant company; ticket agent Mather did nothing but receive the information and convey the same to special agent Rickard, and special agent Rickard was acting as a peace officer, at least up until the time that the parties were taken by him and the conductor Quinlan, from the train. *And so the Court would find that the special officer Rickard was not acting then for and on behalf of the defendant in the performance of his duty, but simply as a local peace officer in making the arrest and in assisting in the ejectment of plaintiff.*

"The Court would further find that conductor Quinlan was negligent in his duty in not protecting his passengers from this unlawful arrest and detention and especially was he negligent and at fault *in assisting in ejecting* plaintiff from the train of which he was in charge, and upon which plaintiff was entitled to ride, under the circumstances shown in the case." (Italics supplied.)

\* \* \* \* \* \*

"So, the Court finds from the evidence that the conductor \* \* \* made no effort to inquire of the plaintiff *after he had assisted in ejecting her from the train* \* \* \* whether she was the party wanted \* \* \*" (Italics supplied.)

In addition, the court adopted one of defendant's specially requested findings absolving defendant from all responsibility for Officer Rickard's acts, reading:

"That Mr. Rickard was acting and did act solely and only as a police officer, to-wit, that of Deputy Sheriff of Valencia County, and in no respect in his capacity as Special Officer or Agent of the defendant Railway Company."

The question then for decision is whether the conductor of a passenger train having aboard passengers whose apprehension is sought as suspects on a criminal charge, upon being informed by a known officer of the law that he has instructions from the police department of a sister city to remove and detain them, renders his superior liable if, accompanied by the officer, he points them out to him and requests them to leave the train. In other words, if the passengers following such request leave the train in the company of the officer, has there been an unlawful ejection by the conductor? I think not under the authorities to be cited and discussed.

The law requires no investigation by the conductor to determine if persons known to him to be officers of the law have a warrant for the arrest of a passenger, or to ascertain whether the charge upon which they are proceeding is one upon which an arrest can legally be made. 10 Am.Jur. 272, § 1463, "Carriers"; (5 R.C.L. 1193, §

617); annotation, 15 A.L.R. 886, supplemented in 42 A.L.R. 168 and 43 A.L.R. 1035. Leading cases sustaining a conclusion of nonliability under the facts here shown are, Mayfield v. St. Louis, I. M. & S. R. Co., 97 Ark. 24, 133 S.W. 168, 32 L.R.A.,N.S., 525 and case note; Thompkins v. M. K. & T. Ry. Co., 8 Cir., 211 F. 391, 52 L.R.A.,N.S., 791, and case note; Bowden v. Atlantic Coast Line R. Co., 144 N.C. 28, 56 S.E. 558, 12 Ann.Cas. 783; Owens v. Wilmington & W. R. Co., 126 N. C. 139, 35 S.E. 259, 78 Am.St.Rep. 642; Brunswick & Western R. R. Co. v. Ponder, 117 Ga. 63, 42 S.E. 430, 60 L.R.A. 713, 97 Am.St.Rep. 152; Burton v. New York Cent. & H. R. R. Co., 147 App.Div. 557, 132 N.Y.S. 628, affirmed without opinion, 210 N.Y. 567, 104 N.E. 1127; Clark v. Norfolk & W. Ry. Co., 84 W.Va. 526, 100 S.E. 480, 7 A.L.R. 117; Birmingham Ry., Light & Power Co. v. Lipscomb, 198 Ala. 653, 73 So. 962.

Perhaps the latest statement of the law on the subject by any text is that to be found in 10 Am.Jur. 272, § 1463, under the topic, "Carriers." It reads:

"A conductor is under no duty to make an investigation to ascertain if persons whom he knows to be officers of the law have a warrant for the arrest of a passenger, or to find out whether the charge on which they are proceeding is one for which an arrest can be legally made."

The editor of an extensive annotation of the subject; "Liability of carrier to passenger for assault by third person", appearing in 15 A.L.R. 868, states the law pertinent to the present discussion at page 885 of the annotation as follows:

"A conductor is not bound to make an investigation to ascertain if persons whom he knows to be officers of the law have a warrant for the arrest of a passenger, or to find out whether the charge on which they are proceeding is one for which an arrest can be legally made. Therefore, a carrier is not liable for an assault by an officer of the law in making an illegal arrest, unless its conductor knows of the illegality."

Expressions are to be found in some of the cases to the effect that if the conductor or other servant of the carrier actively participates in the wrongful arrest of a passenger, liability will attach. Few cases appear in which the principle of the exception has been applied. The leading examples are: Gillingham v. Ohio River R. R. Co., 35 W.Va. 588, 14 S.E. 243, 14 L.R. A. 793, 29 Am.St.Rep. 827 and Anania v. Norfolk & Western Ry. Co., 77 W.Va. 105, 87 S.E. 167, L.R.A.1916C, 439.

The distinction between those cases and the one before us is clearly brought out in a later decision by the same court, Clark v. Norfolk & W. Ry. Co., supra, in which the facts are very similar to those in the case at bar. The court said (page 481):

"In the Gillingham Case the conductor of the train actually caused plaintiff's arrest for an offense committed in his presence, and which, by the exercise of proper diligence, he was bound to know plaintiff

was innocent of. After sending for the officer to make the arrest, the conductor pointed out Gillingham to him as the guilty person; whereas the guilty party was shown to be another passenger occupying the seat behind him. The assault for which the arrest was made was committed on the conductor, and he pointed out to the officer the wrong man as the one who had committed it.

"In the Anania Case, the officer, who happened to be on the train at the time, arrested Anania and some other passengers for disorderly conduct, which occurred in the presence of the conductor and the officer. Anania had been guilty of no misconduct. The opinion in that case states that the conductor knew, or if reasonably diligent ought to have known, that fact. It was clearly the duty of the conductor in that instance to have protested, at least, against Anania's arrest.

"But here the facts are quite different. It is a fact, proven and not disputed, that the conductor and brakeman in charge of the train all knew that the men who forced plaintiff to alight were officers, and in such case the law imposes no duty upon the carrier or its servants or agents to inquire into the officer's authority, or substitute their opinions for his, or to protest against his arresting a passenger. A passenger train is not intended as a place of refuge for criminals, and unless a passenger is arrested for an offense of which the carrier's agent knew, or by proper diligence ought to have known, he is not guilty, he is not obliged to interfere or protest against the arrest. The rule, however, is different where the carrier's servants know, or by the exercise of proper diligence ought to know, that the arrest of the passenger is unlawful, as was the case in Anania v. Norfolk & Western Ry. Co., supra.

\* \* \* \* \*

"In this case the brakeman's advice to plaintiff to 'go ahead off,' if he said it, which the brakemen all deny, and plaintiff was not able to identify the person who, he says, told him, is not evidence of any intent to aid the officers. According to plaintiff's testimony, the request was made simply to avoid further trouble. There is no evidence whether or not defendant's servants knew that plaintiff's suit case was properly labeled as containing whisky, or that they knew why the officers ejected him from the car. Knowing that they were officers, the defendant's agents were under no duty to inquire into the legality of their acts. The following authorities are in point and support the principles announced in this opinion: 4 R.C.L. 1194; 10 C.J. 908; Nashville C. & St. L. R. Co. v. Crosby, 183 Ala. 237, 62 So. 889; Louisville & Nashville R. Co. v. Byrley, 152 Ky. 35, 153 S.W. 36, Ann.Cas.1915B, 240; Brunswick & Western R. Co. v. Ponder, 117 Ga. 63, 43 S.E. 430, 60 L.R.A. 713, 97 Am.St.Rep. 152; and Thompkins v. M., K. & T. Ry. Co. [8 Cir.], 211 F. 391, 128 C.C.A. 1, 52 L.R.A.(N.S.) 791."

Burton v. N. Y. Cent. & H. R. R. Co., 147 App.Div. 557, 132 N.Y.S. 628, affirmed

without opinion, 210 N.Y. 567, 104 N.E. 1127, presents a factual situation similar in many respects to that present in the case under consideration. It was obviously a case of mistaken identity. The young woman arrested accompanied by her mother was taken from a Pullman berth upon suspicion of being a notorious murderess. Upon being confronted by officers who stated their purpose, the conductor directed them to the berth occupied by the plaintiff and her mother. As proof of knowledge by the officers and by the conductor that this was a case of mistaken identity, the mother of the plaintiff testified:

" 'I am not the woman that is wanted. Can't you do something for me?' I said. 'I am not the one. There is a mistake here.' And he said, 'You had better go along without any trouble.' I partly dressed the both of us, and the two men and the conductors of the train took us to the stateroom."

Thus, where, as in the case at bar, the conductor led the officers to the seat occupied by the suspects and made a statement of similar import with reference to the suspects' duty to leave the train, a directed verdict in favor of the defendant was held to be proper. The court said (page 630) :

"This action is brought, not against the officers, but against the defendant railroad company, upon the theory that it was the duty of the defendant to perform its contract of carriage, and to protect the plaintiffs against the indignities and the humiliations to which they were subjected by the officers. The case is peculiarly aggravating. From the evidence it appears that these women, having no connection with the Indiana or any other crime, were treated with great brutality by the officers, who apparently felt that they had a license to forget all that belongs to their office as peace conservers, and to bully these two defenseless women, whom they had been told by telegraph from Rochester were identified with the Indiana crimes, and it would be worth while to deal with them as the facts seem to warrant, but that case is not here for determination. The question here is as to the duty of the defendant in the premises.

\* \* \* \* \* \*

"Being authorized to make the arrest, the peace officers would have been justified in using any force necessary to this end, and the agents and servants of the defendant would have been acting contrary to law if they had refused to permit the arrest to be made. The peace officers, acting within their authority, superseded the authority of the conductor and servants of the defendant in charge of the train, the plaintiffs, by operation of law, were transferred to the custody of the policemen, and the train officials ceased to have any control over them, and the defendant could not, therefore, be held liable for any of the indignities suffered by the plaintiffs. This was practically decided in the case of Newman v. New York, Lake Erie & Western R. R. Co., 54 Hun, 335, 7 N.Y.S. 560, where

a railroad detective arrested a suspicious character who had purchased a ticket, and was waiting for the departure of a train. The prisoner was taken before a police magistrate and held, and the court held that the arrest might be justified under the circumstances disclosed by the evidence, and that the detention by the police magistrate could not involve the defendant in damages, even though the peace officer making the arrest was in its employ, so long as it was not shown that the prisoner was detained at the instance of the officer."

The dissenting opinion of Mr. Justice Thomas drew to its support the concurrence of none of the other justices. It presents practically every argument that can be advanced in support of the plaintiff's contention in the case at bar.

Mayfield v. St. Louis, I. M. & S. R. Co., supra, is one of the leading cases upon the subject of liability of a carrier for wrongful arrest of a passenger on one of its trains. It and the other cases cited along with it supra represent varying degrees of asserted participation by servants of the carrier in an alleged unlawful arrest of a passenger aboard the carrier's train. In each instance liability of the carrier was rejected upon an application of the principles hereinabove stated.

The difficult position of servants of the carrier incident to notice of illegality of the arrest is pointed out in a case note entitled "Liability of a carrier for the wilful torts of his servants to passengers," 40

L.R.A.,N.S., 999, the quoted language appearing at page 1073, as follows:

"In jurisdictions where the right to maintain an action against a carrier for a wrongful arrest is treated as being determinable with reference to the theory of a duty on the carrier's part to afford protection to his passengers, that duty is deemed to be absolute only as regards arrests made by the carrier's servants on their own initiative. In respect of arrests made by officers of the law, a passenger cannot recover damages unless he can prove that the carrier's servants were guilty of some positive misconduct with relation to the tort. It has been laid down that such misconduct may be inferred where the servants had notice, actual or constructive, of the illegality of his arrest, and failed to take such measures as were requisite for his protection. But apparently no case has yet been decided in which the defendant's liability turned directly upon the nature and extent of the obligations which such notice imposed upon his servants. When the point is actually presented, the manifest difficulties involved in a doctrine which seems to offer to the carrier's servants the dilemma of an election between interference with the execution of criminal process and a cause of action which will render their employer liable for damages may lead to its definitive repudiation. Be this as it may, there can be no doubt that, in the absence of evidence of such notice, liability cannot be imputed to the carrier on the mere ground that he did not inquire into the authority of the officers, nor

resist them and prevent the arrest. It is also clear that, irrespective of the question of notice, he may be held liable if his servants actively participated in the arrest. But such participation is not established by testimony which merely shows that a servant in charge of a railway train or other vehicle of transportation pointed out the passenger as the person indicated by a telegram sent to the officer who made the arrest, or facilitated the entrance of the officers into a place where the passenger had taken refuge, or stopped the train while the arrest was being effected. Nor is the carrier under any duty to see that the officers use only such force as is necessary to make the arrest."

For annotations dealing with liability of the carrier for false arrest caused by agent or servant, a related subject, see 35 A.L.R. 645, 664, supplemented in 77 A.L.R. 927, 931.

The discussion earlier in this opinion of the obvious fact that the two women removed from the train were the identical persons whose apprehension was sought under the Jane Doe and Jane Roe warrants is important only as demonstrating that if the investigation suggested in the prevailing opinion had been made, it would have been futile. Certainly, the object of any such investigation would have been to prove the identity of the suspects and to establish by implication their innocence. The guilt or innocence of the accused was a matter about which the conductor was under no duty to inquire, having recogniz-

ed in the one seeking the arrest a known officer of the law. The officer having taken into custody the very persons he was ordered to detain, the question of their guilt or innocence was for determination in due course, either in the courts or upon a clearing up of the question of identity before the Albuquerque police department, prior to reaching the courts.

The result declared by the majority in my opinion visits upon an unoffending carrier responsibility for apparent mistakes of others, either that of the prosecuting witness in furnishing a description or of officers of the law in procuring process and effecting an arrest. That the defendant had nothing to do with instigating the prosecution and issuance of the Jane Doe warrants is conceded by all. And in view of the unanimity of opinion that no duty rests upon the conductor even to inquire of a known officer whether he has a warrant for arrest of a passenger whose apprehension is sought, possession of a defective warrant or no warrant at all could not affect defendant's liability. Hence, the discussion in the prevailing opinion upon the sufficiency of a Jane Doe warrant and as to probable cause for arrest of a suspected person is beside the point except in the apparent view of the majority that it supports liability on the part of defendant. That this consideration furnishes no support is fully demonstrated by the decisions.

The extent of the conductor's participation as found by the court was to request the plaintiff and her sister to leave the

train with the officer who accompanied him. The conductor and the officer dispute even this request but the court's finding must be accepted. The trial judge in several instances speaks of the conductor's participation as "co-operation" with the officer. If plaintiff's removal from the train was inevitable; if, as cannot be doubted, the officer was there to take her into custody and compel her removal, then it fairly cannot be said she would have been permitted to continue her journey but for the conductor's request. The latter's' act was therefore not the proximate cause of her removal. Hence, the defendant is not liable.

It is, of course, the duty of the citizen, when requested, to assist a known officer of the law.

"According to the better considered authorities, private persons may respond to the call of a known officer, without waiting for information as to the offense which the criminal has committed, and without pausing to inquire into the regularity of the process; and whoever, in good faith, renders assistance and obeys the orders and directions of a known public officer in response to a call for assistance is protected in making an arrest, although the officer may be acting wrongfully and may be personally liable for a false arrest. This protection is due to the necessity of immediate action, since if all those summoned were required to examine and judge of the legality of the warrant and then act upon their own responsibility, the power of police officers would be to a great degree paralyzed;" 4 Am.Jur. 80, § 129.

· See the leading case, Firestone v. Rice, 71 Mich. 377, 38 N.W. 885, 15 Am.St. Rep. 266 and case notes, 44 Am.St.Rep. 136; 14 L.R.A.,N.S., 1123; 13 Ann.Cas. 195. See, also, sections 35-2707 and 106-108, 106-109, Comp.St.1929; the former making it a criminal offense to refuse upon request to assist officers "in the execution of their office"; the latter sections rendering it a punishable offense for any "free, white male" person to fail to respond to the call of an officer in executing "any process", criminal or civil.

It apears obvious to·me that the courts, in relieving the conductor of all duty to inquire into legality of the arrest or possession of a warrant by a known officer of the law, have measurably, at least, given the conductor the status of a private citizen called upon to assist an officer. Whether consciously or not, and I believe not unwittingly, exactly the same immunity is afforded by the better reasoned authorities as respects nonliability of the conductor or his superior on account of illegality in the arrest. In other words, even without formal request for assistance, the conductor, up to a certain point at least, is afforded the same immunity from liability because of illegality in the arrest which the private citizen may claim only following a request for assistance by the officer.

In pointing out the suspected person to an officer, the conductor is assisting or co-operating to a degree in effecting the ar-

rest. Yet, such action is within the immunity from liability afforded both the conductor and the carrier by the authorities. The majority do not contend such an act violates the contract of carriage. But they say, having pointed out the passenger, to go further and request peaceable acquiescence in what the officer stands ready physically to enforce, departure from the train in the officer's company, is actionable. The challenged finding that the conductor refused to answer plaintiff's question as to reason for her removal in no way alters the legal rights of the parties.

The doctrine announced by the majority, in my opinion, is unsound and beset with dangers. It renders too short the step from mere acquiescence and consequent non-liability to actual obstruction of the officer by trainmen in an effort to avoid liability under a rule so exacting. It practically makes a tightrope walker of the conductor in an effort to fulfill his duty as a good citizen on the one hand and to protect his superior from liability on the other. Thus torn between conflicting duties, deception as to presence on the train of suspects and even positive obstruction to officers of the law in their efforts to make arrests may often be the consequence.

Without more extended discussion, I am satisfied the conductor did not inject himself into the arrest in a manner rendering his superior liable. His train was due to leave when he was confronted by a person known to him to be an officer of the law and presumably armed. The identical persons whose immediate apprehension was sought under the Jane Roe and Jane Doe warrants were on his train, although admittedly they were not the persons involved in the offense charged. He conducted the officer to their seats and requested them to accompany the officer from the train. I am unable to find in the facts presented tortious conduct by defendant toward plaintiff unless we are to impose upon the conductor the duty of holding his train against orders while conducting a court of inquiry of doubtful outcome, presenting issues he was poorly qualified to pass upon and the decision of which he was still less prepared to enforce save in open defiance of a recognized peace officer. Persuasive precedents and sound reason deny such an alternative.

BICKLEY, Justice (dissenting).

I concur in the opinion of Mr. Justice SADLER. It appears from the record that defendant's participation in the removal of the plaintiff from the train was not of its own instigation or volition. The defendant's servant, the train conductor, acted under compulsion of the law that requires the citizen to assist a known law officer when called thereto. With the law officer at the conductor's elbow ready to accomplish the removal of the plaintiff from the train, it would be drawing the matter too fine to hold the defendant liable in damages because the conductor failed to insist on the law enforcement officer doing the talking. The inconvenience to plaintiff

flowing from her removal from the train and the consequent delay in her journey seems inevitable and had defendant's servant failed to render the cooperation required by the officer the consequences would likely have been more embarrassing to her. The suggested possibility that had the conductor merely pointed out the plaintiff as the person wanted and insisted on the officer doing his own talking and that maybe the plaintiff could have talked the officer out of detaining her and removing her from the train seems too remote to alter my conclusion.